**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert E. BRITT, Defendant-Appellant.**

**No. 74–2001.**

United States Court of Appeals, Fifth Circuit.

Feb. 28, 1975.

Rehearing Denied March 24, 1975.

\*   \*   \*   \*   \*   \*

Charles D. Read, Jr., Decatur, Ga., Richard L. Parker, Atlanta, Ga., for defendant-appellant.

John W. Stokes, U. S. Atty., E. Ray Taylor, Jr., U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before DYER, MORGAN and GEE, Circuit Judges.

GEE, Circuit Judge:

Robert E. Britt was charged along with five other individuals in a 27-count indictment. He personally was named in 21 of the 27 counts, each of which charged that a specific individual was induced to travel in interstate commerce to Atlanta, Georgia, in the execution of a scheme to defraud that individual of over $5,000. Three of the six defendants plead guilty to the counts in which they were charged, one was acquitted, and the charges against another were dismissed by the government. Mr. Britt, the appellant, was convicted by a jury of 14 counts of violating 18 U.S.C. § 2314.[1]

Britt was the president of Fitts Cotton Goods, a company which specialized in the manufacture of diapers. In the fall of 1970, the company, which at the time was in serious financial straits, began selling distributorships in order to raise much-needed capital. A number of these distributorships were sold, including sales to each of the 27 persons listed in the indictment. According to the evidence, potential distributors would be summoned to Atlanta. There they were promised that as distributors they would have the exclusive right to a territory after training, with the resulting benefit that each would receive a five percent commission on all sales to existing business in his territory and a ten percent commission on all sales to new business which he acquired for the company. In order to induce potential distributors to purchase territories—the purchase price varied according to the size and supposed lucrativeness of the territory but ranged from $5,000 to $25,000—Mr. Britt and his co-defendants painted glowing but patently false pictures of the volume of Fitts' existing business. There is no doubt that figures shown or related to the distributorship purchasers purporting to reflect orders from active accounts currently buying from the company in a given territory were grossly exaggerated. Lists given to the purchasers supposedly containing the names of current accounts, in fact, turned out to be composed, in large part, of retailers who were out of business, were no longer doing business with Fitts, or who had never done business with Fitts to begin with. Most of the distributorship purchasers found that, contrary to what they had been led to believe, they were able to sell few, if any, diapers. Most received almost nothing in commissions and, therefore, lost almost their entire investments. Naturally, Fitts never refunded anything to its defrauded diaper distributors.

An investigation was begun after a number of complaints from disgruntled distributorship purchasers were communicated to the FBI. Eventually a search warrant was obtained. The warrant was, basically, for all the business records of Fitts Cotton Goods and named as the place to be searched the ostensible

---

1. 18 U.S.C. § 2314. Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting

  * * * * * *

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person to travel in, or to be transported in interstate commerce in the execution or concealment of a scheme or artifice to defraud that person of money or property having a value of $5,000 or more;

  * * * * * *

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

  * * * * * *

offices of the company, two suites of offices at 3379 Peachtree Road, Atlanta. When FBI agents served the warrant at 3379 Peachtree they were met by a Mr. Brewer, the comptroller of Fitts. After the agents completed their search of 3379 Peachtree, they proceeded to a second address, 1819 Peachtree. Although 1819 Peachtree was not mentioned in the warrant, the agents believed that they had the right to conduct a search there because Mr. Brewer, the comptroller, had, upon questioning, informed them of the existence of Fitts' offices at 1819, had given them permission to search there, had accompanied them to the address, and had obtained the key and opened the door for them. Mr. Britt, however, moved to suppress all records discovered at 1819 Peachtree, claiming that the search there was not a consent search since Mr. Brewer had given permission under the mistaken impression that the warrant for 3379 authorized the FBI to search all Fitts' offices, including those at 1819. The trial court, agreeing with Britt, ordered the 1819 evidence suppressed. At the same time, however, he indicated that "the government may be able to obtain the document from 1819 Peachtree Road by subpoena, warrant or other legal process if it can show that the information forming a basis for such process is in no way tainted by the illegal search and seizure."

Although a number of papers were seized at 1819 Peachtree and later subpoenaed, only two types of documents found there were used by the government in building its case against Britt. The first of these were invoices from which the government was able to calculate the exact sales volume of Fitts in the various territories—and thus dramatically demonstrate how gross were the exaggerations related to the distributorship purchasers. The second was a list which contained the names and telephone numbers of all Fitts distributors. It is undisputed that a list of Fitts distributors containing the same names but *sans* telephone numbers was seized during the legal search[2] at 3379 Peachtree. Britt claims, however, that the list with telephone numbers was used, before it was subpoenaed, to contact previously unknown distributors. He says that all investigations based upon the numbered list were fruits of the poisonous tree and that all evidence gathered as a result of these investigations, including especially the testimony of those of the 27 distributors who were unknown to the FBI prior to the seizure, must be suppressed. We hold that all challenged evidence was properly admitted.

We shall briefly summarize the series of moves and countermoves that led to the eventual admission of the testimony of the distributors and the evidence as to sales figures, omitting several which are irrelevant to this appeal. First, appellant moved to suppress on Fourth Amendment grounds. The court granted this motion but suggested that the subpoenaing of the same evidence might be possible. Then the government subpoenaed both the invoices and the numbered distributor list. Appellant moved to quash. This motion was denied. Next followed appellant's motion for a protective order, the object of which was to insure exclusion of all evidence seized at or derived from the search at 1819, including everything subpoenaed. This was also denied. Finally, the evidence was admitted at trial over objection only after the court was convinced of the bona fides of the government's asserted independent bases for its subpoenaing of the invoices and the distributor lists. In the meantime, the government had appealed from the initial suppression order, but early on requested that the appeal be dismissed when it learned that the court would probably uphold the subpoena.

Fortunately, it is not our task to analyze systematically the court's response to each of these moves and coun-

---

**2.** Appellant has never challenged the legality of the first search.

termoves and to judge whether one or some can be reconciled with another or others. We are concerned only with the ultimate question of whether the court erred when, at trial, it admitted evidence over appellant's objections. If the evidence was admissible, it is immaterial to us and harmless to appellant that the trial court's particular rationale for admitting it cannot stand close scrutiny. Thus, although we question whether the government demonstrated that it had independent knowledge of the existence of the invoices *prior to* the time it requested the subpoena[3] and although we doubt that the independent basis theory can support the government *use* of the numbered list to contact potential witnesses when most of the FBI investigation was apparently conducted during the interim between the time of seizure and suppression, we nevertheless hold that the evidence was properly admitted because we are of the opinion that Mr. Britt did not have standing to challenge the validity of the search and seizure at 1819 Peachtree Road.

▇▇ Only a "person aggrieved" by an unlawful search and seizure may move for the return of the seized property and insist that it be suppressed. F.R. Cr.P. 41(e) & (f). We have held that under certain circumstances a corporate officer or employee can be a person aggrieved by a search of corporate premises and a seizure of corporate property. Henzel v. United States, 296 F.2d 650 (5th Cir. 1961). The facts of this case, however, are much different from those of *Henzel.* There

> . . . the appellant was the organizer, sole stockholder and president of Chemoil Corporation. Appellant prepared much of the material seized, and this material was kept in his office along with some of his personal belongings. Although he was temporarily absent from his office when it was searched, appellant spent the greater part of every average working day

there. Finally, it is undisputed that the search by the Postal Inspector was "directed at" the appellant.

*Henzel,* at 653. Here, although Britt was president of Fitts, he was not its sole stockholder, the documents seized were normal corporate records not prepared personally by him, and the area searched at 1819 Peachtree Road was described as a "storage area."[4] Furthermore, there is no evidence that Britt spent any of his time working in the storage area—or in any other space at 1819 Peachtree for that matter—or that any of the material seized there was taken from his personal desk or briefcase or files. He was in the hospital at the time of the search and had been for several months prior to it. Furthermore, there is nothing in the record which would indicate that the searches, either at 3379 or 1819, were directed at him rather than at corporate activity generally. Under such circumstances, we conclude that we should apply the normal rule which is that,

> When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity.

Lagow v. United States, 159 F.2d 245, 246 (2d Cir. 1946), cert. denied, 331 U.S. 858, 67 S.Ct. 1750, 91 L.Ed. 1865 (1947). This rule, of course, has been tempered by the holding of the Supreme Court in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), as we explained in *Henzel, supra.* But it remains applicable in situations similar to the one which we here face in which a corporate officer seeks to suppress ille-

---

**3.** We have no doubt that it demonstrated at trial that it could easily have obtained such knowledge.

**4.** This description, provided by FBI Agent Decker, is undisputed in the record.

gally-seized corporate records and claims standing essentially simply because he is a corporate officer. Neither *Henzel* nor Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) are contra. In both of these cases there was a demonstrated nexus between the area searched and the work space of the defendant. That nexus is absent here.

Appellant raises a number of other alleged errors. We have examined these and found them to be without merit. They are rejected.

Affirmed.