**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 15 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

### TENET CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

JAMES S. ANDERSON,

Defendant-Appellee.

No. 97-6310

Appeal from United States District Court
for the Western District of Oklahoma
(D.C. No. 96-CR-129)

Arlene Joplin, Assistant United States Attorney (Patrick M. Ryan, United States Attorney, Edward J. Kumiega and Daniel G. Webber, Jr., Assistant United States Attorneys, on the brief), Oklahoma City, Oklahoma, for the appellant.

Frank J. Petrella, Tucker, Georgia, for the appellee.

Before **PORFILIO**, **KELLY**, and **BRISCOE**, Circuit Judges.

**BRISCOE**, Circuit Judge.

The government appeals the district court's order granting James Anderson's motion to suppress evidence seized in a warrantless search. We exercise jurisdiction pursuant to 18 U.S.C. § 3731 and affirm.

I.

Anderson was arrested after a successful FBI sting operation. The goal of the sting operation was to identify and prosecute members of the Internet chat room known as the "Orchid Club" for interstate trafficking of child pornography. The Orchid Club investigation began in California and proceeded to Oklahoma City with the arrest of Paul Buske in June 1996. Following his arrest, Buske cooperated with the government in an undercover capacity by contacting a fellow Orchid Club member who used the pseudonym "AnnBoleyn" and arranging to trade him child pornography. "AnnBoleyn" was to send Buske blank videotapes to use to tape child pornography. Buske would then send the tapes back to "AnnBoleyn" at a prearranged mail box. The FBI suspected Anderson was "AnnBoleyn" and arranged for a controlled delivery of blank tapes to the specified mail box and secured a search warrant for Anderson's home in Duluth, Georgia. These suspicions were confirmed when Anderson picked up the tapes sent to "AnnBoleyn."

The tapes were to be delivered on Friday, July 5, 1996, but were delayed until Saturday, July 6, because of the Fourth of July holiday. The mail box

business where the tapes were delivered was closed on Saturday, but Anderson had arranged for the business to leave the package at an adjoining coffee shop. Anderson went to the coffee shop on Saturday, July 6, to pick up the package. FBI agents, including Agent Bradley, observed Anderson pick up the package and drive away in his car. Instead of traveling to his home, Anderson drove to his place of employment. Anderson was Vice President of Research and Development for ATD Corporation. Anderson used his key card to enter the ATD office building, taking the tapes with him, and the door locked behind him.

As the agents were concerned Anderson would view the tapes and suspect the involvement of law enforcement when he discovered the tapes were blank, they decided to immediately arrest him. They knocked on the office building doors and activated a siren on a patrol car, but Anderson did not respond. The agents did not know Anderson is hearing impaired and that he did not hear the knocks or the siren because he was not wearing his hearing aids. When Anderson failed to respond, the agents became concerned he was destroying the tapes and other child pornography evidence. Agent Bradley testified his concern was heightened because he thought the building might contain an incinerator. He based this belief on his knowledge that ATD Corporation was involved in the research and development of heat resistant materials. The agents' concern that Anderson would destroy evidence was also based on Agent Bradley's previous

-3-

experiences in investigating Orchid Club members. Agent Bradley had found members of the group to be extremely suspicious and fearful of being "set up" by agents. As a result of his prior investigations of Orchid Club members, Agent Bradley also knew they tended to keep their collections in one location. If Anderson had decided to view the tapes at his office, the agents were concerned his entire collection was stored there and that he would destroy all evidence if he was alerted to their presence.

Acting on these concerns, the agents broke into the office building and began searching for Anderson. Anderson did not hear them calling his name. Agent Bradley noticed a light under the closed door of Room 222, an interior office. Room 222 had a single door leading to the hallway, a narrow sidelight window next to the door and one other window. Agent Bradley could not see into the room because the door was closed and the curtains were drawn over the sidelight window with a towel attached to the curtains to further block any view into the room. Agent Bradley opened the unlocked door without knocking and found Anderson preparing to watch one of the videotapes.

Anderson signed a written waiver of his *Miranda* rights, made incriminating statements to the agents detailing his involvement with child pornography on the Internet, and admitted he had child pornography stored in his office. Anderson then gave consent to search his office, Room 218. The agents

-4-

did not perform a general search of Anderson's office, but rather recovered the pornography from the location identified by Anderson. Shortly thereafter, Anderson and the agents went to Anderson's home and the agents executed the search warrant. Upon arrival at his home, Anderson told his wife the agents were there because he possessed child pornography. Anderson then showed the agents where he had stored the disks and tapes of child pornography. While at Anderson's home, approximately four hours after entry into his office building, Anderson signed a written consent to search both his office building and his home.

Anderson was indicted on August 6, 1996, for engaging in a conspiracy to knowingly receive and distribute child pornography via the Internet, in violation of 18 U.S.C. § 2252(a)(2)(b), and two counts of knowingly transporting and shipping child pornography, in violation of 18 U.S.C. § 2252(a)(1). Anderson moved to suppress the evidence seized from his place of employment and his residence, as well as statements made by him at both locales. The district court found Anderson had standing to seek suppression and ordered suppression of the evidence seized from Anderson's office building and the statements made while he was interrogated at his office building. The court denied suppression of evidence seized from his home and statements he made to his wife in the presence of the agents because the search of his home was made pursuant to a valid warrant

and his statements there were spontaneous and not the result of any police questioning.

In suppressing the evidence seized and statements taken at the office building, the district court concluded Anderson had standing to assert his Fourth Amendment rights. The court concluded Anderson's actions demonstrated a subjective expectation of privacy in Room 222. The court then concluded this expectation was reasonable by first finding a corporate officer may assert a reasonable expectation of privacy to his or her corporate office, and since Anderson was a corporate officer with a master key to the corporate building and offices therein, except for the president's office, he had standing to assert a Fourth Amendment claim to the entire building. While we disagree with the district court's holding that a corporate officer with a key to the building has standing to assert a Fourth Amendment claim to the entire building, we ultimately agree with the district court that Anderson had standing to seek suppression of the evidence and statements obtained as a result of the search of Room 222, but we reach that conclusion by a different route. See United States v. Winningham, 140 F.3d 1328, 1332 (10th Cir. 1998) (court can affirm district court on different basis as long as there is support in the record). We also agree with the district court that the government did not establish the existence of exigent circumstances justifying the warrantless entry into the office building.

-6-

The government appeals that portion of the district court's order granting suppression of evidence seized from Room 222 and statements made during that seizure. The government contends Anderson lacks standing to challenge the search of an area within his corporate office building when Anderson has shown neither proprietary nor possessory interest in Room 222, nor a business nexus between his work and Room 222. The government also contends there was sufficient evidence to establish exigent circumstances to justify the warrantless entry into the office building.

II.

**Standing**

We must first determine whether Anderson has standing to challenge the search and seizure of items from Room 222. "Whether a defendant has standing to challenge a search is a legal question subject to de novo review." United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996).

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search is unreasonable, and therefore unconstitutional, if the defendant has a legitimate expectation of privacy in the area searched. "Determining whether a legitimate or justifiable expectation of privacy exists . . . involves two inquiries." United States v. Leary, 846 F.2d

592, 595 (10th Cir. 1988). First, the defendant "must show a subjective expectation of privacy in the area searched, and second, that expectation must be one that 'society is prepared to recognize as "reasonable."'" Id. (quoting Hudson v. Palmer, 468 U.S. 517, 525 (1984)). The "ultimate question" is whether one's claim to privacy from the government intrusion is reasonable in light of all the surrounding circumstances. Id. Thus, Anderson was required to establish he had a subjective expectation of privacy in Room 222 and that society would recognize that subjective expectation of privacy as reasonable.

Anderson entered the ATD office building during a holiday weekend and there were no other employees in the building. He used his corporate key card to enter the building and the door locked behind him. Once he was inside Room 222, he closed the door. The blinds and curtains were closed over one window, the curtains were closed over the sidelight window, and Anderson had attached a towel over the sidelight window curtains to further block any view into the room. Clearly he believed he would be alone and left undisturbed. Accordingly, we conclude Anderson had a subjective expectation of privacy in Room 222.

Whether Anderson's subjective expectation of privacy is one society is prepared to recognize as reasonable is a more difficult inquiry. "Given the great variety of work environments . . . the question whether an employee has a reasonable expectation of privacy [in his work area] must be addressed on a case-

by-case basis." O'Connor v. Ortega, 480 U.S. 709, 718 (1987); see also Henzel v. United States, 296 F.2d 650, 653 (5th Cir. 1961) ("This is not to say that every employee of a corporation can attack the illegal seizure of corporate property. . . . Each case must be decided on its own facts."). In addressing this question, we are mindful that the "'expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home.'" Leary, 846 F.2d at 597 n.6 (quoting New York v. Burger, 482 U.S. 691, 700 (1987)).

It is well established that an employee has a reasonable expectation of privacy in his office. See Mancusi v. DeForte, 392 U.S. 364, 369 (1968); Leary, 846 F.2d at 595 ("There is no doubt that a corporate officer or employee may assert a reasonable or legitimate expectation of privacy in his corporate office."); Specht v. Jensen, 832 F.2d 1516, 1520 (10th Cir. 1987). Therefore, Anderson clearly had standing to challenge the search of his office. However, Room 222 was not Anderson's office. [1] Therefore, we must determine to what extent an employee has standing to challenge the search of an area in his workplace that is not his office. We begin by acknowledging, as at least one other circuit has done,

---

[1] Room 222 was an empty room with no files or a desk, or even a telephone. There was no name plate on the door. There is no indication in the record that Anderson used the room on a regular basis or even on a single occasion before July 6, 1996. A company official testified that Room 222 was a vacant room that could be used by all personnel. Anderson testified the room was vacant and "had no use at all." Appellant's App. at 98.

that a corporate employee does not have standing to challenge the search of corporate offices or other property merely because the employee has access to or control over certain areas.    See United States v. Baron-Mantilla , 743 F.2d 868, 870 (11th Cir. 1984) (mere possession of a key to the premises searched is insufficient to confer standing).

Most cases that discuss employee standing involve seizure of work-related documents from the workplace.  In such cases, the relationship or "nexus" of the employee to the area searched is an important consideration in determining whether the employee has standing.    See United States v. Mohney  , 949 F.2d 1397, 1403-04 (6th Cir. 1991) (en banc) (defendant did not have standing to challenge seizure of documents which he did not prepare when they were stored in offices he rarely visited);   United States v. Taketa  , 923 F.2d 665, 670-71 (9th Cir. 1991) (defendant did not have standing to challenge search of coworker's desk in adjoining office even though he had access to it, but he did have standing to challenge search of his own desk);    United States v. Chuang  , 897 F.2d 646, 649-51 (2d Cir. 1990) (defendant could not challenge seizure of documents found in another employee's office);    United States v. Torch  , 609 F.2d 1088, 1091 (4th Cir. 1979) (defendant did not have standing to challenge search of building when he was not present at time of search, he did not work for building owner although he occasionally used the building, he did not have assigned work area, and the desk

-10-

he occasionally used was not locked and all employees had access to it); United States v. Britt , 508 F.2d 1052, 1056 (5th Cir. 1975) (corporate president did not have standing to challenge seizure of documents from off-site warehouse because he failed to demonstrate a "nexus between the area searched and [his] work space").

We endorse the "business nexus" test to the extent we share the belief that an employee enjoys a reasonable expectation of privacy in his work space. Certainly, an employee should be able to establish standing by demonstrating he works in the searched area on a regular basis. However, we do not believe the fact that a defendant does or does not work in a particular area should categorically control his ability to challenge a warrantless search of that area. Instead, the better approach is to examine all of the circumstances of the working environment and the relevant search. See Mancusi , 392 U.S. at 368 (performing standing inquiry "in light of all the circumstances"). There are numerous circumstances which are highly relevant when considering whether an employee should have standing to contest the search and seizure of items from his workplace for which the "business nexus" test does not account. [2]

---

[2] Contrary to the dissent's assertion that we have failed to reference any case in which a defendant has been determined to have standing in the absence of a nexus between the area searched and the defendant's work space, see Dissenting Op. at 1, we cite United States v. Mancini , 8 F.3d 104, 108 (1st Cir. 1993)

(continued...)

-11-

Ownership of an item does not confer "automatic standing." However, the Supreme Court has long recognized that property ownership is a "factor to be considered in determining whether an individual's Fourth Amendment rights have been violated." United States v. Salvucci, 448 U.S. 83, 91 (1980); Rawlings v. Kentucky, 448 U.S. 98, 105 (1980) ("[P]etitioner's ownership of the drugs is undoubtedly one fact to be considered in [determining whether he has standing]"); see also United States v. Benitez-Arreguin, 973 F.2d 823, 827 (10th Cir. 1992) ("In analyzing the case of a bailee, we consider the factors that generally might give any defendant a legitimate expectation of privacy, *including ownership*, lawful possession, or lawful control *of the property* or place searched.") (emphasis added); United States v. Erwin, 875 F.2d 268, 270-71 (10th Cir. 1989) ("Although ownership of the item seized is not determinative, it is an important consideration in determining the existence and extent of a defendant's Fourth

---

[2](...continued)
(defendant worked downstairs and seized items were found in storage space in attic), where the court emphasized the importance of (1) the fact that the items seized were at least partially personal possessions, (2) the fact that defendant was mayor of the city, (3) the fact that the attic was in the same building as defendant's office, (4) the fact that the mayor had taken steps to insure his privacy in the items seized. As in the present case, there was no indication the mayor had ever worked in the attic or regularly used the attic before the evidence was seized, the attic was located far from the mayor's office, and the attic was accessible by numerous employees (the entire maintenance and personnel departments). Further, we cite several additional cases where courts have found no standing where there was no business nexus, but each case also emphasized the items seized were *not* personal possessions.

-12-

Amendment interests."). Thus, a court is more apt to find an employee has standing to challenge the seizure of personal items or the search of an area where personal items are stored than the search or seizure of work-related documents or materials. This is true even when an employee brings personal possessions into the workplace where they are obviously not as secure as they would be at home. See United States v. Mancini, 8 F.3d 104, 108 (1st Cir. 1993) (court emphasized seized books were at least partially personal possessions); cf. Williams v. Kunze, 806 F.2d 594, 599-600 (5th Cir. 1986) (in denying standing, court emphasized seized records were corporate property); State v. Richards, 552 N.W.2d 197, 205 (Minn. 1996) (finding defendant did not have standing when "nothing about the [seized] items or the manner in which they were stored reveals anything of personal or private nature"); State v. Worrell, 666 P.2d 703, 706 (Kan. 1983) (court emphasized defendant stored no personal property in warehouse where he was asserting standing). In O'Connor, the Supreme Court discussed the effect on the issue of standing when property seized from a defendant's workplace is personal property rather than business property:

> Because the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context, it is essential first to delineate the boundaries of the workplace context. The workplace includes those areas and items that are related to work and are generally within the employer's control. At a hospital, for example, the hallways, cafeteria, offices, desks, and file cabinets, among other areas, are all part of the workplace. These areas remain part of the workplace context even if

the employee has placed personal items in them, such as a photograph placed in a desk or a letter posted on an employee bulletin board.

*Not everything that passes through the confines of the business address can be considered part of the workplace context, however*. An employee may bring closed luggage to the office prior to leaving on a trip, or a handbag or briefcase each workday. While whatever expectation of privacy the employee has in the existence and the outward appearance of the luggage is affected by its presence in the workplace, the employee's expectation of privacy in the contents of the luggage is not affected in the same way. The appropriate standard for a workplace search does not necessarily apply to a piece of closed personal luggage, a handbag or a briefcase that happens to be within the employer's business address.

480 U.S. at 715-16 (emphasis added). See also Wayne R. LaFave, Search & Seizure § 11.3(d) ("Particularly in an otherwise close case, a court may be influenced by the defendant's relationship to or interest in the particular item seized. It may be significant, therefore, that this item is a personal possession of the defendant and not something connected with the operation of the business.").

Moreover, we believe an employee has a greater expectation of privacy in items in his immediate control, regardless of the business connection he may or may not have to the room where the items are found. See United States v. Brien, 617 F.2d 299, 306 (1st Cir. 1980) (citing as one factor supporting existence of standing the fact that defendant was present during search); LaFave § 11.3(d) ("Generally, it may be said that the fundamental inquiry is whether the particular defendant had a protected expectation of privacy, and that in making this determination it is useful to consider such factors as *whether the defendant was*

-14-

*present at the time of the search* .") (emphasis added); cf. United States v. Cardoza-Hinojosa , 140 F.3d 610, 616 (5th Cir. 1998) (emphasizing defendant left scene aware building was not locked); Taketa , 923 F.2d at 671 (emphasizing fact that defendant was not present at time of search in ruling defendant did not have standing); Torch , 609 F.2d at 1091 (same). Focusing on the defendant-employee's control over the seized item at the time of the seizure is consistent with the approach taken by the Supreme Court in Mancusi . In Mancusi , the defendant claimed he had standing to challenge seizure of records from an office he shared with others. The Court noted defendant shared his office with others and the seized records were not located in an area of the room which was "reserved for his personal use," but ultimately held defendant had standing. In reaching this conclusion, the Court emphasized defendant worked in the area *and* defendant " *had custody of the papers at the moment of their seizure* ." 392 U.S. at 369 (emphasis added).

Finally, we find the "business nexus" test problematic in that it does not take into account any actions the individual challenging the seizure may or may not have taken to maintain privacy with respect to the item. We believe it is appropriate to consider whether an employee took steps to keep his personal property private in the workplace in determining whether the employee had a reasonable expectation of privacy in the area searched. See Mancini , 8 F.3d at

-15-

110 (court focused on fact that mayor had clearly marked seized books as private property); cf. Cardoza-Hinojosa, 140 F.3d at 616 (defendant did not have standing to challenge search of shed where circumstances revealed a "careless (if not nonexistent) effort" to maintain privacy interest therein); United States v. Alewelt, 532 F.2d 1165, 1168 (7th Cir. 1976) (defendant did not have standing to challenge seizure of his coat which he stored on a coat rack in general working area of public building); Richards, 552 N.W.2d at 205 (court emphasized defendant stored personal item in workplace without marking it as his own); see also LaFave § 11.3(d) ("Assessment of a defendant's privacy expectation vis-a-vis the item may also be aided by considering if he *dealt with that item in a fashion which reflects an effort on his part to maintain privacy*.") (emphasis added); Specht, 832 F.2d at 1520 (highlighting fact that defendant closed his office doors and drapes when he left his office).

Therefore, in determining whether an employee has standing to challenge seizure of an item from the workplace, we do not limit our analysis to the "business nexus" test. Rather, we will consider all of the relevant circumstances, including (1) the employee's relationship to the item seized; (2) whether the item was in the immediate control of the employee when it was seized; and (3) whether

the employee took actions to maintain his privacy in the item. [3]

Anderson entered the locked ATD office building on a Saturday, during a holiday weekend, with the videotapes. These tapes were not ATD property but were Anderson's personal possessions. He took the tapes into Room 222, shut the door behind him, and covered the sidelight window. He clearly took these actions to maintain his privacy. Anderson maintained control over the videotapes and did not abandon the tapes or even try to store the tapes in the room. In fact, he was still in possession of the tapes when the agents searched Room 222 and seized them. Under these circumstances, we conclude Anderson's subjective expectation of privacy was an expectation that society would recognize as reasonable. We hold Anderson has standing to challenge the government's search and seizure of items from Room 222, as well as the statements Anderson made in relation to that

---

[3] The government argues the so-called "apartment cases" control. See, e.g., United States v. Nohara, 3 F.3d 1239, 1242 (9th Cir. 1993). We disagree. These cases stand for the proposition that a tenant does not have a reasonable expectation of privacy in common areas such as the hallways of an apartment building. There are significant differences between a tenant's relationship to a hallway in his apartment building and Anderson's relationship to Room 222. While both would presumably have total *access* to the respective areas, Anderson also had the authority to *exclude* others from Room 222. Obviously, a tenant does not have the authority to exclude others from a common hallway. The right to exclude others is an important consideration in determining whether an individual has standing. See Rakas v. Illinois, 439 U.S. 128, 148-49 (1978); Katz v. United States, 389 U.S. 347 (1967); Jones v. United States, 362 U.S. 257 (1960); LaFave § 11.3(c). Anderson did in fact exclude others from Room 222 by closing the door and covering the sidelight window.

search.

**Exigent circumstances**

The warrantless search of the ATD office building was presumptively unconstitutional unless the government can establish an exception to the warrant requirement existed at the time the building was searched. "The notion that emergency circumstances may in appropriate cases make a warrantless search constitutional if probable cause exists is a clearly established exception to the warrant requirement." United States v. Aquino, 836 F.2d 1268, 1270-71 (10th Cir. 1988). "The existence of exigent circumstances is a mixed question of law and fact." United States v. Anderson, 981 F.2d 1560, 1567 (10th Cir. 1992). "Although we accept underlying fact findings unless they are clearly erroneous, 'the determination of whether those facts satisfy the legal test of exigency is subject to de novo review.'" Id. (quoting United States v. Stewart, 867 F.2d 581, 584 (10th Cir. 1989)).

The government bears the burden of proving exigency. United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993). In assessing whether the burden was met, we are guided by the realities of the situation presented by the record. We should evaluate the circumstances as they would have appeared to prudent, cautious, and trained officers. Id. There is no absolute test for determining

-18-

whether exigent circumstances are present because such a determination ultimately depends on the unique facts of each controversy. However, we have recognized certain general factors. Id.

> An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home of an unknown suspect should be (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indications of exigency that are not subject to police manipulation or abuse.

United States v. Carr, 939 F.2d 1442, 1448 (10th Cir. 1991). Finally, we should remember that, "[a]s an exception to the warrant requirement, exigent circumstances must be 'jealously and carefully drawn.'" Anderson, 981 F.2d at 1567 (quoting Aquino, 836 F.2d at 1270).

Since the agents witnessed Anderson retrieve the controlled package from the coffee shop and carry the package into the ATD office building, there was probable cause to believe Anderson had committed a crime at the time the agents entered the office building. Further, distribution and production of child pornography are serious crimes. See United States v. Moore, 916 F.2d 1131, 1139 (6th Cir. 1990) ("Child pornographers commit serious crimes which can have devastating effects upon society and, most importantly, upon children who are sexually abused."). However, whether the agents conducted a limited search of the building is a closer question. Agent Bradley testified he and the other

-19-

agents searched for Anderson throughout the building and, after he was located, the agents conducted a search of Room 222 and a limited search of Anderson's office. However, the initial search for Anderson, broad as it was, was at least partially necessary because of Anderson's hearing impairment. The later search of Anderson's office was based on his consent.

The decisive consideration in this case is the government's failure to demonstrate the presence of any "circumstances where the destruction of evidence is likely" or any "clearly defined indications of exigency." Carr, 939 F.2d at 1448. To constitute "exigent" circumstances, the government must present something more than an unfounded belief by law enforcement officers on the scene that the suspect is becoming suspicious or nervous. See, e.g., United States v. Scroger, 98 F.3d 1256, 1259-60 (10th Cir. 1996), cert. denied 117 S. Ct. 1324 (1997) (defendant answered door with drug manufacturing equipment in hand; defendant's hands were stained, an indication of drug manufacturing; and there was a strong odor of drugs from the house); Carr, 939 F.2d at 1446-49 (officers smelled drugs and heard commotion and shouting inside room); Aquino, 836 F.2d at 1273 (suspects were released, creating possibility news of police involvement in operation would spread, and drug courier's phone rang during the delay); United States v. Chavez, 812 F.2d 1295, 1299-1301 (10th Cir. 1987) (garage doors shut and lights off when police arrived); see also Wicks, 995 F.2d at 971

-20-

(collecting cases).

To support its likelihood of destruction of evidence and exigency arguments, the government essentially points to three factors: (1) Agent Bradley's belief that Anderson's entire child pornography collection was being stored inside the office building; (2) Agent Bradley's concern about the presence of an incinerator in the office building; and (3) Anderson's failure to respond to the agents knocking on the office doors or to the patrol car siren. Based on his previous law enforcement experience, it may have been reasonable for Agent Bradley to believe other contraband was stored inside the office building. Nevertheless, that factor alone was insufficient to justify a warrantless entry and search. Anderson, 981 F.2d at 1567-68. As for the presence of an incinerator, that was simply speculation on the part of Agent Bradley and there were no objective indications that an incinerator (or any other item) was being used to destroy evidence. With respect to the third factor, we are not convinced Anderson's failure to respond to the knocks or the siren could have led a reasonable officer to conclude destruction of evidence was imminent. We note Anderson was inside a large, two-story, multi-room office building and there was no evidence the agents knew precisely where he was in the building. Under these circumstances, we are not convinced Anderson (whether hearing impaired or not) reasonably could have been expected to hear the knocks or the siren or to respond

-21-

to them.

As an additional matter, we are concerned with the potential for government manipulation under the facts of this case. The agents testified at the suppression hearing they were concerned Anderson would destroy any evidence stored in the office building if he was alerted to their presence. However, notwithstanding this alleged concern, the agents proceeded to knock on the doors and activate a siren to alert Anderson to their presence. In short, the agents helped create the circumstances they allegedly believed would cause Anderson to attempt to destroy evidence.

For these reasons, we believe the district court correctly concluded "the government presented no evidence that would permit a 'prudent, cautious' officer to assume that destruction of evidence was imminent or that an emergency was occurring in the building." Appellant's App. at 77. Thus, exigent circumstances did not exist at the time of the warrantless search of the ATD office building.

## III.

The government's search of Room 222 was unconstitutional. Accordingly, the items seized during that search and the statements Anderson made at the office building must be suppressed. See Wong Sun v. United States, 371 U.S. 471 (1963). The district court's order suppressing evidence seized from the ATD office building and statements made by Anderson while he was being interrogated

at his office building is AFFIRMED.

No. 97-6310, United States v. James S. Anderson.

**KELLY** , Circuit Judge, dissenting.

The court determines that Mr. Anderson has standing to challenge the search and seizure of evidence from Room 222. I disagree that Mr. Anderson has standing with respect to Room 222 or any corporate common areas. Mere possession of videotapes in an unlocked room that Mr. Anderson neither worked in, nor used regularly, is not sufficient to confer standing. Although the factors the court relies upon are relevant to the inquiry,  see United States v. Cardoza-Hinojosa , 140 F.3d 610, 615 (5th Cir. 1998), they cannot alone support standing for a workplace search in these circumstances absent a demonstrated "nexus between the area searched and the work space of the defendant,"  United States v. Britt , 508 F.2d 1052, 1056 (5th Cir.),  cert. denied , 423 U.S. 825 (1975). Such a nexus is nonexistent in this case. It is telling that the court cites no case involving a workplace where standing was found in the absence of such a nexus. [1]

---

[1]  United States v. Mancini , 8 F.3d 104 (1st Cir. 1993), is not to the contrary. In that case, the defendant mayor had standing to challenge a search of the town's archive attic, located above the mayor's office, and seizure of his 1987 appointment calendar which contained entries of both a personal and public nature. The attic contained boxes of town records, as well as a box labeled "Mayor's Appointment Books." The court emphasized the physical relationship between the mayor's office and the archive attic, as well as the direction and control that the mayor, who had the position for nineteen years, exercised over access. Mancini 8 F.3d at 110. This court is mistaken that "there was no indication the mayor had ever . . . regularly used the attic before the evidence was seized . . . ." Ct. Op. at 11-12, n.2. To the contrary, the certificates of occupancy that the mayor allegedly issued in exchange for a $2,000 payment were stored in

(continued...)

Merely because work-related documents are not involved in this case does not mean that we can overlook the nature of the area searched.

Although "the Fourth Amendment protects people, not places," Katz v. United States, 389 U.S. 347, 351 (1967), the facts concerning the relationship between the person and the place searched are important in determining whether the person has met his or her burden of demonstrating a reasonable expectation of privacy, see Rakas v. Illinois, 439 U.S. 128, 130-31 n.1 (1978). Whether an expectation of privacy is legitimate for Fourth Amendment purposes depends upon "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." Oliver v. United States, 466 U.S. 170, 183 (1984). In deciding this issue, the Court considers location-- whether a person or his possessions are in a home, car, curtilage, open field or office. Without question, the warrant clause of the Fourth Amendment applies to searches on commercial premises, see Marshall v. Barlow's, Inc., 436 U.S. 307, 311-12 (1978); See v. City of Seattle, 387 U.S. 541, 543 (1967), however, commercial premises differ from personal residences in nature and use, and therefore Fourth Amendment protection is more limited. See Donovan v. Dewey,

---

[1](...continued)
boxes of building department records located in the attic, Mancini, 8 F.3d at 106, and the mayor also stored boxes containing his files and appointment calendars, id. at 110. Mancini simply is not a case where there is no connection between the employee's work space and the area searched.

452 U.S. 594, 598-99 (1981). Where commercial premises are not open to the public, "the reasonable expectation of privacy depends upon the particular nature and circumstances surrounding the place to be searched." United States v. Bute , 43 F.3d 531, 536 (10th Cir. 1994); see See, 387 U.S. at 545.

The district court found that Mr. Anderson was present during a holiday and had taken steps to maintain his privacy in Room 222 by closing the door, shutting the blinds and curtains, and by placing a towel over one of the windows. See Aplt. App. at 75. This court extends the analysis by focusing on one of the items found in the search of the room, the videotapes in Mr. Anderson's possession, and holds that Mr. Anderson has standing to challenge the search and statements made in connection with it. Under the court's analysis, Mr. Anderson would have standing to challenge a search anywhere in the building provided the item seized was owned and controlled by him, and he had taken steps to maintain privacy. This analysis relies too heavily on Mr. Anderson's possession of the seized videotapes when the primary question must be whether Mr. Anderson had a legitimate expectation of privacy in the area searched, an objective inquiry. See United States v. Salvucci , 448 U.S. 83, 92 (1980) ("We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy in the area searched."); Rawlings v. Kentucky , 448 U.S. 98, 104-06 (1980) ("Had petitioner placed his drugs in

plain view, he still would have owned them, but he could not claim any legitimate expectation of privacy."); United States v. Skowronski, 827 F.2d 1414, 1418 (10th Cir. 1987) ("Whether a person has standing to contest a search on fourth amendment grounds turns on whether the person had a legitimate expectation of privacy in the area searched, not merely in the items seized."). In deciding standing issues, we must consider all of the circumstances, Rakas, 439 U.S. at 152 (Powell, J., concurring), including Mr. Anderson's relationship with the area searched.

Numerous circumstances in this case show the complete absence of any nexus between Room 222 and Mr. Anderson's work space, let alone a nexus between Mr. Anderson and the entire building. Room 222 was not Mr. Anderson's office, and no evidence before us suggests that he ever used the room prior to the incident. It was located far from his office, near several common areas (a reception area, restrooms, a conference room and a hallway). The room was vacant, containing no desk, files, or even telephone. It had no particular function, and was accessible by all employees. Mr. Anderson was found, pants undone, in the room, with a blank tape in the VCR. Contrary to the court's assertion, no evidence before us suggests that Mr. Anderson had the right to exclude anyone from the room; one does not gain such right merely by closing the door and covering a window.

The steps that Mr. Anderson took to ensure privacy may be consistent with a subjective expectation of privacy, but that is not enough, no matter how earnestly the steps were taken. In these circumstances, consistent with Mr. Anderson's burden to prove standing, I would hold that he lacked standing and reverse. I therefore respectfully dissent.