FILED
United States Court of Appeals
Tenth Circuit

July 10, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MARK ALDEN MONGOLD and
CLAUDIA MARIE MOORE,

      Defendants - Appellants.

Nos. 12-7073 & 12-7075
(D.C. Nos. (6:12-CR-00033-JHP-1-2)
(E.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ, MCKAY,** and **MATHESON,** Circuit Judges.

I.  **INTRODUCTION**

      Mark Mongold and Claudia Moore ("Defendants") were charged as felons in

possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1). The charges arose

from evidence the police found during a March 6, 2012 search of Ms. Moore's home.

Each Defendant filed a motion to suppress the evidence from the search. After a hearing,

the magistrate judge issued a report and recommendation ("R&R") that the motions to

_____

      * This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

suppress be denied. The district court relied on the magistrate judge's R&R and denied the motions. The Defendants conditionally pled guilty. They appeal their convictions, alleging that the district court erred in denying their motions to suppress. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse and remand this case to the district court for further review.

## II. **BACKGROUND**

The facts recited here reflect the findings of the district court, which adopted findings made by the magistrate judge. We accept the district court's findings of fact related to a motion to suppress unless they are clearly erroneous. *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998). Findings of fact are clearly erroneous only if they are "without factual support in the record or if," after reviewing the record, we have a "firm conviction that a mistake has been made." *Manning v. United States*, 146 F.3d 808, 812 (10th Cir. 1998) (quotations omitted). The magistrate judge found the Government's account more credible than the Defendants'. That determination was not clearly erroneous. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."). Because we are reviewing the district court's denial of a motion to suppress, we recite the facts "in the light most favorable to the [G]overnment." *United States v. Polly*, 630 F.3d 991, 996 (10th Cir. 2011) (quotations omitted).

## A. *Facts*

In 2010, Special Agent Ashley Stephens of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") visited Ms. Moore's residence while investigating a large drug conspiracy and found a federal fugitive hiding there. Ms. Moore admitted to selling drugs within that conspiracy. She was not charged or convicted as part of that conspiracy, but Agent Stephens learned that Ms. Moore was a convicted felon.

In early 2012, Agent Stephens received anonymous calls from two of Ms. Moore's neighbors complaining about the high volume of traffic entering and leaving her property. After receiving these calls, Agent Stephens and other officers conducted surveillance of traffic at Ms. Moore's home. They noticed four different vehicles parked in her driveway on one occasion and three cars entering and leaving during a 40-minute period around noon on another day. The officers did not attempt to ascertain who owned the cars. This was the only suspicious activity the officers observed at the home.

Around a week later, on March 6, 2012, Agent Stephens and three other officers conducted a "knock and talk" at Ms. Moore's home. At the Defendants' detention hearing, Agent Stephens testified that he "arrived at the front door and knocked on the door. You could hear scurrying and shuffling within the residence, which immediately caused us concern. The door was then opened by an individual later identified as Mark Mongold." ROA, Vol. II (12-7075), at 14. He added, "Prior to opening the door, the male from inside asked who it was and we said it was the police." *Id.* At the suppression hearing, Agent Stephens testified that, after they knocked a male voice asked who was

-3-

there and they responded, "The police." ROA, Vol. II (12-7075), at 79. Then "there was scurrying" or "loud movements" inside and "a short delay" before the door was opened. *Id.* at 79, 92. The sounds did not include toilets flushing or people's voices.[1]

After the delay, Mr. Mongold, who had been living in the home for several months, opened the door. Agent Stephens smelled marijuana and recognized what he believed were prison tattoos on Mr. Mongold. Agent Stephens asked for Ms. Moore. Mr. Mongold told him that he would go get her and turned to walk to the back of the house to find her. The officers followed him inside even though they did not have permission to enter the house. Once inside, Agent Stephens saw ammunition in a bedroom. He knew that Ms. Moore was a felon and that it was illegal for her to have firearms or ammunition. Agent Stephens also believed Mr. Mongold was a felon, based on his tattoos.

Agent Stephens directed the home's four residents—Ms. Moore, Mr. Mongold, and Ms. Moore's two adult children—onto the front porch. Agent Stephens told them that he had smelled marijuana and had seen ammunition in the home. He then informed them of their *Miranda* rights and asked them each to sign a form consenting to a search

---

[1] Defendants argue that the delay, which Mr. Mongold testified was "[m]aybe two minutes," ROA (12-7073), Vol. II at 156, was caused by Ms. Moore's adult son, Robert Maes, going to tell Mr. Mongold that the police were at the door and Mr. Mongold proceeding to the door from the back of the house. Mr. Mongold also testified that he was the one who asked who was at the door, prompting the police to announce their presence, immediately before the door was opened. We accept the district court's determination that Agent Stephens's testimony was more credible than the Defendants' and view all evidence in the light most favorable to the Government.

of the home. All four occupants consented. After receiving the occupants' consent to search, officers re-entered the home and found a small amount of marijuana, drug paraphernalia, bags containing white powder, ammunition, a shotgun, and a revolver.

## B. *Suppression Hearing*

The Government charged Mr. Mongold and Ms. Moore as felons in possession of firearms and ammunition under 18 U.S.C. § 922(g)(1). The Defendants filed motions to suppress the evidence from the entry as unlawful. They argued that the police had no legal justification to enter the home.

A magistrate judge conducted the suppression hearing on May 14, 2012. At the hearing, Agent Stephens testified that he did not have enough probable cause for a warrant at the time of the knock and talk. But he explained that he entered the home out of concern that the "scurrying and shuffling" sounds he heard might indicate the destruction of evidence and that he or the other officers might be in danger.

Mr. Mongold's and Agent Stephens's testimonies differed on a few important points. First, Agent Stephens admitted that he did not have permission to enter. Mr. Mongold went even further, testifying that he told the officers they could not enter and tried to shut the door before he looked for Ms. Moore. He testified that Agent Stephens blocked the door with his foot and "bulldogged" his way past Ms. Moore's adult daughter to get into the home. Second, Mr. Mongold testified that, after the officers entered the home, some of them repeatedly drew and pointed firearms at him, but he did not know which ones. Agent Stephens testified that he never drew his firearm and was not aware

-5-

that any of the other officers did.  Third, Mr. Mongold contended that he was handcuffed before being taken to the porch and did not believe he was free to leave.  Agent Stephens said that they handcuffed the Defendants only after telling them they were under arrest.

The magistrate judge determined that the officers had "reasonable suspicion of criminal activity at the time of the 'knock and talk'" based on the traffic at the home, prior criminal activity there, and Ms. Moore's prior criminal acts.  ROA (12-7073), Vol. I at 40.  The magistrate judge also concluded that the scurrying sounds, the smell of marijuana, and the presence of known or suspected felons justified the officers' entry "to secure evidence and for their own safety."  *Id.*

The magistrate judge also determined that the Government had shown by a preponderance of the evidence that the consent of all four residents was voluntary and not obtained through duress or coercion:  the Defendants gave their consent on an open porch, there was no threat of physical violence, the officers gave *Miranda* warnings, and Agent Stephens carefully explained the consent form to the occupants before they signed.

The magistrate judge recommended that the district court deny the Defendants' motions to suppress.  The Defendants objected to the magistrate judge's R&R.  After review, the district court adopted the magistrate judge's R&R, denying the Defendants' motions to suppress the evidence from the search.

### C. *Conviction, Sentencing, and Appeal*

The Defendants entered conditional guilty pleas, preserving the ability to appeal the court's denial of their motions to suppress.  The district court sentenced Mr. Mongold

to 57 months of imprisonment and Ms. Moore to 33 months. The Defendants filed timely appeals.

## III. **DISCUSSION**

The Fourth Amendment generally requires a warrant for searches and seizures within a home; otherwise, the search or seizure is presumptively unreasonable. *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006); *Lundstrom v. Romero*, 616 F.3d 1108, 1128 (10th Cir. 2010). Unless an exception to the warrant requirement exists, warrantless entries are "unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within" the home. *Payton v. New York*, 445 U.S. 573, 588 (1980); *see also Manzanares v. Higdon*, 575 F.3d 1135, 1142 (10th Cir. 2009). The officers in this case did not have a warrant to enter Ms. Moore's home. The district court should have suppressed the evidence obtained from their entry unless the exceptions for (A) exigent circumstances or (B) consent applied.

### A. *Exigent Circumstances*

The presumption of unconstitutionality for warrantless searches may be overcome by "reasonable exceptions," such as when "the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (quotations omitted); *see also United States v. Martinez*, 643 F.3d 1292, 1296 (10th Cir. 2011). These exigencies can include entering a home to aid an injured individual in an emergency, to protect an occupant from imminent injury, to catch a fleeing suspect in

"hot pursuit," and to prevent the destruction of evidence. *King*, 131 S. Ct. at 1856. The Government bears the heavy burden of proving that a warrantless entry was lawful based on exigent circumstances. *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006).

"The existence of exigent circumstances is a mixed question of law and fact." *United States v. Anderson*, 154 F.3d 1225, 1233 (10th Cir. 1998) (quotations omitted). "Although we accept underlying fact findings unless they are clearly erroneous, the determination of whether those facts satisfy the legal test of exigency is subject to de novo review." *Id.* (quotations omitted).

In a one-page order, the district court adopted the magistrate judge's R&R as "well-reasoned and based upon applicable law." ROA, Vol. I (12-7075) at 58. The R&R accepted Agent Stephens's account of the underlying facts as "more credible" than the Defendants'. With little analysis, the R&R determined that the "officers were justified in entering the residence to secure evidence and for their own safety." The R&R concluded that warrantless entry was necessary either (1) to prevent the destruction of evidence of a "serious crime" or (2) to protect officer safety, but it did not explain how the evidence established these exigent circumstances. We therefore apply the tests for these two kinds of exigent circumstances to the district court's factual findings to determine whether the warrantless entry was justified.

1. **Destruction of evidence**

We employ a four-part test to determine whether the likelihood of destruction of evidence justified the officers' warrantless entry. The test requires that an officer's entry

-8-

be "(1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of the evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988).

Officers must meet all four elements of the *Aquino* test before the destruction of evidence exception to the warrant requirement applies. The Government meets the first element here because, at the very least, the smell of the drugs established clear evidence of probable cause for possession of marijuana. *See, e.g.*, *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1260 (10th Cir. 2008) (determining that the smell of marijuana can establish probable cause of drug possession).

The second element includes two components: (a) the exception is only available for serious crimes; and (b) destruction of evidence must be likely. The Government failed to meet the first component and therefore the second element of the *Aquino* test.

"Serious crime" is not well-defined. In *Illinois v. McArthur*, 531 U.S. 326, 336 (2001), and *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984), the Supreme Court explained that penalties are the best indication of whether a crime is "serious," but it never set a threshold for what penalty qualifies to make a crime "serious." We begin by addressing whether marijuana possession is a serious crime because, at minimum, the officers had probable cause for possession of marijuana.

In *McArthur*, the Court determined that the possession of marijuana justified temporarily barring the defendant from his home. 531 U.S. at 336. Because a home search is a greater intrusion than briefly preventing entry to a home, the Court declined to address whether possession of marijuana justified a warrantless home search. *Id.* ("Temporarily keeping a person from entering his home, a consequence whenever police stop a person on the street, is considerably less intrusive than police entry into the home itself in order to make a warrantless arrest or conduct a search.").

In *United States v. Carter*, 360 F.3d 1235 (10th Cir. 2004), we determined that "possession of a small quantity of marijuana [was] in all likelihood a misdemeanor" and did "not reach the level of 'serious crime' required by *Aquino*." *Id.* at 1242. Here, Oklahoma considers marijuana possession a misdemeanor that is not punishable by more than one year in prison. Okla. Stat. tit. 63, § 2-402.

Based on the foregoing, if marijuana possession is the only crime for which the officers in this case had probable cause, the exigency exception for destruction of evidence should not apply because marijuana possession is not a serious crime. We therefore need to address whether the officers had probable cause for a more serious crime—drug trafficking.

In determining whether probable cause for a crime existed, we do not view the evidence "in isolation" but "as . . . factor[s] in the totality of the circumstances." *Maryland v. Pringle,* 540 U.S. 366, 372 n. 2 (2003); *see also United States v. Valenzuela*,

365 F.3d 892, 897 (10th Cir. 2004). Because no case closely matches the facts of this one, we review this circuit's analysis of cases with similar circumstances.

In *Carter*, officers received a tip about "possible drug use and stolen property" at a residence. 360 F.3d at 1238. Based on that information officers proceeded to perform a "knock and talk" at the home around midnight after first driving by the house several times and observing lights on inside. *Id.* After officers arrived, the defendant and a friend emerged from the garage behind the house and "approached the officers in a combative manner." *Id.* The officers identified themselves, and one officer drew his weapon, causing the defendant to stop and drop a bag of marijuana. *Id.* We determined that, based on this combination of factors, the officers had probable cause only for "possession of a small quantity of marijuana." *Id.* at 1242.

By contrast, we have found probable cause for more serious crimes when a tip about drug trafficking at a home was corroborated by other evidence such as interviews with known addicts coming from the home. *United States v. Baca*, 480 F.2d 199, 203 (10th Cir. 1973). In *United States v. Artez*, 389 F.3d 1106 (10th Cir. 2004), an officer received a tip from a reliable confidential informant about an alleged methamphetamine dealer. *Id.* at 1109. The officer corroborated the tip by verifying that the alleged dealer lived at the residence identified by the informant and had a criminal record; collecting corroborating information from another informant; performing two controlled drug purchases using informants; and observing short term traffic at the residence. *Id.* at 1109-10. We determined that this evidence constituted "a 'substantial basis' for . . . probable

-11-

cause" for drug trafficking. *Id.* at 1115. *See also United States v. Corral,* 970 F.2d 719, 727 (10th Cir. 1992) (finding probable cause that drugs were stored at the defendant's residence when a reliable confidential informant told officers cocaine was stored and distributed there; police observed an unusually high volume of visitors entering and leaving the residence, consistent with drug-trafficking; and the defendant attempted to complete a cocaine transaction with undercover detectives at another location); *United States v. Griffin*, 501 F. App'x 751, 756-57 (10th Cir. 2012) (unpublished) (finding probable cause for drug trafficking where officers received a tip about "constant activity" at a home of a convicted felon, observed "short-term traffic" at the home, and found garbage in a nearby alley that contained common drug packaging materials).[2]

This case falls in between *Carter* and *Artez.* Agent Stephens did not have tips from a reliable source about drug dealing, only complaints from anonymous neighbors about traffic at Ms. Moore's home. He corroborated those complaints by witnessing four cars parked in Ms. Moore's driveway on one occasion and three cars coming and going on another, but he never verified who owned the cars or interviewed anyone leaving the home. Combining this information with what he knew about Ms. Moore's drug history, Agent Stephens suspected drug dealing at the home but admittedly did not have enough evidence for probable cause. At the home, he heard "scurrying" and smelled marijuana.

---

[2] This opinion is unreported and is not binding precedent. We cite it here for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

-12-

Based on that evidence, the Government argues he had probable cause to believe a "serious crime" was being committed.

This combination of evidence is sufficient to establish probable cause that a crime—possession of marijuana—was being committed, but there was not sufficient evidence to establish probable cause for drug trafficking. *See, e.g.*, *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1996) (finding probable cause of drug manufacturing where the defendant "answered the door . . . holding a hot plate which is commonly used to manufacture methamphetamine; his fingertips were stained rust-colored which is commonly the result of handling . . . an ingredient in methamphetamine production; and there was a strong odor of methamphetamine production"); *Aquino*, 836 F.2d at 1273 (determining that officers "clearly had probable cause" of the sale of illegal drugs only after the informant successfully acquired a sample of the drugs).

The probable cause evidence here was limited to marijuana possession, and marijuana possession is not a "serious crime." The officers' concern that the Defendants might be destroying evidence of marijuana possession therefore fails the "serious crime" element of the *Aquino* test. Because we determine that the first component of the second element of the four-part test for exigent circumstances is dispositive, we do not address the last two elements of the test.

2. **Officer safety**

We also have recognized concerns for officer safety as a valid exigent circumstance justifying warrantless entry. *United States v. Smith*, 797 F.2d 836, 840

-13-

(10th Cir. 1986). This exception provides that "(1) the law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched." *Id.*

At the suppression hearing, Agent Stephens argued that he feared for his and the other officers' safety because the home's owner, Ms. Moore, was a known felon, and he suspected Mr. Mongold was a felon as well, based on his "prison tattoos." ROA (12-7073), Vol. II at 14-15. On appeal, the Government does not argue that the need to protect the officers' safety excused their entry, but the district court cited it as a basis to justify the officers' warrantless entry of Ms. Moore's home. We therefore address it here.

Officer safety is not an alternative ground to affirm because the first element of the test is dispositive. The Government presented no evidence that the officers had "reasonable grounds to believe that there [was] immediate need to protect their lives or others." *Smith*, 797 F.2d at 840. Before entering the home, the officers had not seen a weapon or any other indication of heightened danger. They could most easily have protected the officers' safety by leaving Ms. Moore's home, not by entering it.

The test for justifying warrantless entry into a home based on the need to protect officer safety requires that the facts establish all three elements of the test. The Government failed to provide evidence to satisfy the first element. The officers'

-14-

warrantless entry therefore was not justified by the need to protect officer safety. Because we determine that the first element of the three-part test is dispositive, we do not address the last two elements of the test.

*     *     *

In sum, the district court erred by accepting the magistrate judge's determination that destruction of evidence and officer safety justified the warrantless entry. The officers' warrantless entry of Ms. Moore's home violated her Fourth Amendment rights and those of the home's other occupants.

## B. *Consent*

Absent exigent circumstances, officers may enter a home without a warrant based on the residents' consent if the officers "are lawfully present in the place where the consensual encounter occurs" and "consent is freely given." *King*, 131 S. Ct. at 1858. But if consent follows immediately after a Fourth Amendment violation, "the government must prove not only the voluntariness of the consent under the totality of the circumstances, but the government must also establish a break in the causal connection between the illegality and the evidence thereby obtained." *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994) (citation omitted) (quotations omitted); *see also Brown v. Illinois*, 422 U.S. 590, 602 (1975) (requiring that, in addition to being voluntary, consent be "sufficiently an act of free will to purge the primary taint" of an initial Fourth Amendment violation (quotations omitted)).

The district court adopted the magistrate judge's R&R, which relied on Agent Stephens's testimony as evidence that the Defendants' consent was voluntary under a totality of the circumstances standard. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). Agent Stephens testified that he directed the home's four residents onto the front porch unhandcuffed. He informed them of their *Miranda* rights, and all four residents voluntarily consented. As explained above, "[w]e do not disturb these factual findings, as they are not clearly erroneous." *United States v. Fernandez*, 18 F.3d 874, 882 (10th Cir. 1994).

Because the district court found no Fourth Amendment violation, it did not address whether the Government purged the Fourth Amendment taint. When, as in this case, the district court determined that the Defendants voluntarily consented but did not address whether a break in the chain of events overcame the initial Fourth Amendment violation, we "review the fruit-of-the-poisonous-tree issue de novo, or remand for the district court to make a finding." *Carter*, 360 F.3d at 1243.

This question requires consideration of "1) the temporal proximity between the police illegality and the consent to search; 2) the presence of intervening circumstances; and particularly 3) the purpose and flagrancy of the official misconduct." *Melendez-Garcia*, 28 F.3d at 1054 (citing *Brown*, 422 U.S. at 603-04). Because the district court is better equipped to address these factual questions in the first instance, we remand this issue to the district court for consideration.

## IV. **CONCLUSION**

The officers' initial entry into Ms. Moore's home violated the Fourth Amendment, obliging the district court to determine whether the violation tainted the occupants' subsequent consents to enter.  Because the district court did not evaluate this issue, we reverse and remand to the district court to make that determination.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge