UNITED STATES of America,
Plaintiff,

v.

Bartice A. KING, et al., Defendants.

Case No. CR–13–0063–F

United States District Court,
W.D. Oklahoma.

Signed 01/21/2015

Travis D. Smith, John S. Han, Robert Don Evans, Jr., Scott E. Williams, Wilson D. McGarry, US Attorney's Office, Oklahoma City, OK, Robin L. Sommer, US Attorney's Office, Wichita, KS, for Plaintiff.

Nathan J. Mays, The Law Offices of Nathan J. Mays PC, Dan B. Gerson, Houston, TX, John D. Cline, Law Office of John D. Cline, Anthony J. Brass, Law Office of Anthony Brass, San Francisco, CA, Robert M. Goldstein, Law Office of Robert Goldstein, Boston, MA, Daniel Brodersen, Brodersen Law Firm, Orlando, FL, Juan Chardiet, Juan Chardiet Attorney at Law, McLean, VA, Craig D. Corgan, Craig Corgan Attorney at Law, Yukon, OK, James D. Henderson, The Law Office of James D. Henderson, Jr., Santa Monica, CA, Michael W. Noland, Noland Defense Firm, Joseph G. Shannonhouse, IV, Shannonhouse Law Offices PLLC, Derek H. Ross, Robert G. McCampbell, Fellers Snider Blankenship Bailey & Tippens, Michael D. McBride, McBride Law Firm, Seth A. Day, Susanna M. Gattoni, Hall Estill, Ronald L. Wallace, The Wallace Law Firm, Andre B. Caldwell, Anthony J. Hendricks, Crowe & Dunlevy, Matthew C. Kane, Ryan Whaley Coldiron Shandy PC, J. Patrick Quillian, J. Patrick Quillian PC, Robert L. Johnston, Law Office of Robert L. Johnston, Lance B. Phillips, Lance B Phillips PC, Paul A. Lacy, Federal Public Defender, Michael S. Johnson, Law Office of Michael S. Johnson, Troy R. Cowin, Lopez Johnson Armenta, David B. Autry, Robert S. Jackson, Perry W. Hudson, Oklahoma City, OK, Alain J. Ifrah, David S. Yellin, Ifrah PLLC, Washington, DC, Ronald Eugene Jenkins, Jenkins & Kling PC, St. Louis, MO, H. Manuel Hernandez, H. Manuel Hernandez PA, Longwood, FL, Michael W. Nielsen, Nielsen Law Firm, Winter Springs, FL, Gordon D. Jones, Jones & Hawley PC, Birmingham, AL, Jerry W. Biesel, Dallas, TX, Steve T. Jumes, Varghese Summersett & Smith, Fort Worth, TX, for Defendants.

## ORDER

STEPHEN P. FRIOT, UNITED STATES DISTRICT JUDGE

Defendant Bartice King's "Second Motion To Suppress Illegally Obtained Evidence" is before the court. Doc. no. 982. The government has responded, doc. no.

1031, and Mr. King filed a reply brief. Doc. no. 1070. An evidentiary hearing was held on January 13, 2015.[1]

### Background

Mr. King moves to suppress all evidence obtained by Karlo Stewart from Data Support Services (DSS) and provided to Immigration and Customs Enforcement Agent Daron Mangiocco.[2] This evidence consists of numerous paper documents as well as documents stored digitally on a thumb drive.[3] (Also called a USB drive or a flash drive, a thumb drive is a small solid-state data storage device.) The challenged evidence was admitted during the hearing on the motion as Court's Exhibits 1 through 11.[4] The court's review of Court's Exhibits 1–11 reveals that the documents taken by Mr. Stewart from the DSS offices include one or more of the following: weekly cash summary, listing of account numbers for various bank accounts, bettors' checks, extensive call detail from DSS telephone bills, the "agents list," cash receipts summary showing names of remitters and dates and amounts of payments, correspondence with legal counsel in Panama, internal emails re: cash management and transfers, wire transfer records, travel records and printouts of email metadata. (The court did not review the contents of the thumb drive.)

All of these documents were obtained by Mr. Stewart from the DSS office building in Panama, while Mr. Stewart was employed as the chief financial officer for DSS and the rest of the Legendz enterprise. Except in one case, in which a document was delivered by Mr. Stewart to Agent Mangiocco by facsimile transmission, the documents were provided by Mr. Stewart to ICE Agent Daron Mangiocco during a series of meetings. Most of the meetings in which documents were delivered occurred at the United States Embassy in Panama. Two meetings occurred at Mr. Stewart's cleaning business. The first meeting between Mr. Stewart and Agent Mangiocco was in January of 2010, but no documents were delivered to Agent Mangiocco at that meeting. Documents were first delivered by Mr. Stewart to Agent Mangiocco in their second meeting, which occurred in February of 2010. The final meeting during which documents were delivered occurred in November of 2010.

### Issues Raised by the Motion and the Government's Response

Mr. King's moving brief argues that the Fourth Amendment applies to the documents because Mr. King is a United States citizen.[5] As no search warrant was obtained for the documents, Mr. King argues that the documents obtained by Mr. Stewart were obtained in violation of the Fourth Amendment and in violation of Panamanian law. Mr. King's arguments

---

1. Except where otherwise indicated, all transcript references are to the January 13, 2015, transcript.

2. References to DSS include Data Support Services and Data Support Services International. These companies had the same officers. Tr. 52–53. As found in the court's James Hearing Findings and Order, regardless of what its record ownership might have been, DSS was the "mother company," or "umbrella," under which other Legendz companies were held or organized. Doc. no. 1021, p. 19, citing Apr. Tr. 31–32. Mr. Stewart testified

there "really is no difference" between DSS and DSS International, Inc. Tr. 52–53.

3. There was also testimony that the thumb drive included documents regarding Mr. Stewart's cleaning business. Mr. King's motion does not challenge those documents.

4. The exhibits consist of ten marked envelopes, plus some loose papers. Most of the documents are contained in the envelopes.

5. Mr. King's status as a U.S. citizen is uncontested and has been confirmed by the court's review of his passport.

rest on the explicit premise that Mr. Stewart, a private individual employed by DSS at the time, effectively became an instrumentality of the United States government for purposes of Mr. Stewart's acquisition and delivery of the documents. Mr. King argues that Mr. Stewart meets the two-pronged test for determining that issue.

In its response brief, the government makes three arguments. *First,* the government argues that Mr. King does not have standing to raise a fourth amendment challenge to the search and seizure of the documents because DSS is a corporation. For this proposition the government cites United States v. Curtis, 537 F.2d 1091, 1094 (10th Cir. 1976). Doc. no. 1031, p.2. *Second,* the government contends that Mr. Stewart did not become a state actor for purposes of the document search and seizure. *Third,* the government argues that, with respect to the agent list (one of the documents), Mr. Stewart did not seize this document by himself. The government argues that Anthony (Tony) Holness, another employee of DSS, obtained the agent list and provided it to Mr. Stewart at a price, unaware when he did so that Mr. Stewart was in contact with ICE. Thus, the government's second and third arguments contend that there was no government actor for fourth amendment purposes.

Mr. King's reply brief argues that the government's brief misstates the law on standing with respect to seizure of documents from a workplace setting. Mr. King argues that the correct test is not whether DSS is a corporation (as the government argues), but whether Mr. King had a subjective expectation of privacy which was violated, and whether that expectation is one which society is prepared to recognize as reasonable. Mr. King argues that under this test, he has standing to bring this fourth amendment challenge. His reply brief also argues that Mr. Stewart was a government actor during the search and seizure of all of the documents.

The above-described issues are the only ones before the court. For example, the government has not argued that any exigencies excused the need for a warrant, or that the inevitable discovery doctrine applies, or that any other exception avoids suppression. The government stands, instead, on the proposition that Mr. King does not have standing, and on the proposition that there was insufficient government involvement in the search and seizure of the documents to invoke the Fourth Amendment. Aside from those two arguments, the government has not presented any developed argument contending that the search was legal within fourth amendment standards or that the exclusionary rule should not apply.

### Discussion

#### 1. *Bartice King's Standing* [6]

As the court indicated from the bench at the hearing, Tr. 5–6, the government's categorical approach to the standing issue—which relies on DSS's corporate status and language in United States v. Curtis, 537 F.2d 1091 (10th Cir. 1976)—is incorrect and is rejected for several reasons.

First, the Curtis language relied on by the government is offered by the Tenth Circuit in that decision as "another reason" for the court's ruling that no constitutional right was infringed. *Id.* at 1094. (The

---

**6.** The Supreme Court has abandoned a separate analysis of "standing" for claims of violations of the Fourth Amendment in favor of an analysis focusing on the substantive question of whether or not the proponent of the motion to suppress had his own fourth amendment rights infringed by the search and seizure which he seeks to challenge. United States v. Leary, 846 F.2d 592, 595 (1988). Nevertheless, these challenges are still commonly analyzed in terms of "standing," *id.* at n.4, and this court uses that nomenclature because it is convenient.

determinative reason for the ruling was that consent had been given for the search.) Accordingly, the language relied on by the government is dicta.

Second, construed as the government proposes, the Curtis dicta is contrary to the United States Supreme Court's decision in Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). In Mancusi, the Court held that the defendant, a union official, had standing to object to an unreasonable search and seizure of union records from an office shared by the union official with other union officials. Mancusi stated that the issue did not depend upon a property right in the invaded place, but upon "whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion." Id. at 368, 88 S.Ct. 2120, citations omitted. Mancusi stated that "[t]he crucial issue, therefore, is whether, in light of all the circumstances, DeForte's office was such a place." Id. Thus, the categorical approach, urged by the government in reliance on the fact that DSS is a corporation, is incorrect under Mancusi.

Third, consistent with Mancusi, Tenth Circuit cases make clear that no one circumstance is determinative and that ownership is only one factor among many to be considered when determining whether an individual may challenge a search and seizure of records from a workplace. See, e.g., United States v. Anderson, 154 F.3d 1225, 1230 (10th Cir. 1998) ("better approach is to examine all of the circumstances of the working environment and the relevant search"); United States v. Leary, 846 F.2d 592, 595 (10th Cir. 1988) ("[t]here is no doubt that a corporate officer or employee may assert a reasonable or legitimate expectation of privacy in his corporate office"; defendants had standing to challenge search of corporate premises and seizure of corporate records); United States v. Daily, 921 F.2d 994, 1002–03 (10th Cir. 1990) (no standing found where neither defendant was an officer, employee, or shareholder of a money brokerage firm and defendants had attempted to distance themselves from the firm so that they had insufficient privacy interests to object to allegedly illegal search), overruled on other grounds.

The proper test is quoted below, as it is expressed in Leary. In Leary, the Tenth Circuit found that an individual defendant, who was a vice-president at F.L. Kleinberg Company, had standing to challenge the seizure (by warrant) from the offices of F.L. Kleinberg Company of correspondence, telex messages, contracts, invoices, purchase orders, shipping documents, technical data, and other business records and communications. See, id. at 594 (description of property). The court stated as follows.

Whether a person has standing to contest a search on fourth amendment grounds turns on whether the person had a legitimate expectation of privacy in the area searched, not merely in the items seized. Determining whether a legitimate or justifiable expectation of privacy exists, in turn, involves two inquiries. **First**, the claimant must show a subjective expectation of privacy in the area searched, and **second**, that expectation must be one that society is prepared to recognize as reasonable. The ultimate question is whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances.

Id. at 595, quotations and citations omitted, boldface added. Leary then went on to note, "There is no doubt that a corporate officer or employee may assert a reasonable or legitimate expectation of privacy in his corporate office." Id. quotations and citations omitted.

In Anderson, decided approximately ten years after Leary, the Tenth Circuit elabo-

rated on the extent to which an employee has standing to challenge the search of an area in his workplace which is not his personal office space. Anderson, 154 F.3d 1225, 1230. The defendant, who was suspected of trafficking in child pornography, had standing to challenge a warrantless search of a vacant room in his office building and the seizure of blank videotapes from that room. Id. at 1233. The court began by acknowledging that mere access to or control over certain areas is not enough to show standing. Id. at 1230.

Although work-related documents were not the subject of the seizure in Anderson, the court reviewed a number of cases which address a defendant's standing to challenge seizures of work-related documents from the workplace, stating as follows:

> Most cases that discuss employee standing involve seizure of work-related documents from the workplace. In such cases, the relationship or 'nexus' of the employee to the area searched is an important consideration in determining whether the employee has standing.
>
> \* \* \* \*
>
> We endorse the 'business nexus' test to the extent that we share the belief that an employee enjoys a reasonable expectation of privacy in his work space. Certainly, an employee should be able to establish standing by demonstrating he works in the searched area on a regular basis. However, we do not believe the fact that a defendant does or does not work in a particular area should categorically control his ability to challenge a warrantless search of that area. Instead, the better approach is to examine all of the circumstances of the working environment and the relevant search. There

are numerous circumstances which are highly relevant when considering whether an employee should have standing to contest the search and seizure of items from his workplace for which the 'business nexus' test does not account.

Id. at 1230.

Anderson then states that ownership does not confer automatic standing but is a factor. Id. at 1231. Other factors which are material per Anderson and the authorities which Anderson parenthetically describes include: lawful possession or lawful control of the property or of the place searched; whether the items are personal or work-related items; the defendant's interest in or relationship to the evidence seized; whether the evidence is within the defendant's immediate control; whether the defendant was present at the time of the search; whether the location was locked or otherwise secured; and the extent to which the defendant maintained control of the items. Id. at 1230–33.

Anderson states, "Therefore, in determining whether an employee has standing to challenge seizure of an item from the workplace, we do not limit our analysis to the 'business nexus' test. Rather, we will consider all of the relevant circumstances, including (1) the employee's relationship to the item seized; (2) whether the item was in the immediate control of the employee when it was seized; and (3) whether the employee took actions to maintain his privacy in the item." Id. at 1232.

█ Here, the court finds the following facts established by the evidence.

Mr. King was the owner of the company or companies known as Data Support Services or DSS.[7] DSS was the operating company through which the Legendz inter-

---

**7.** The government has asserted, accurately (and Mr. King has not denied), that Mr. King was the "Founder, President and Chief Executive Officer" of the Legendz enterprise, doc. no. 708, at 9 (Government's summary of evidence) and that "[a]lthough DSS was registered under the names of defendants Max McLaren and Maria Rojas, along with Steve

net gambling enterprise did business. Mr. King was also the sole owner of the building in which DSS was housed at the time the records were taken by Mr. Stewart from the DSS building. *See*, Tr. 13. Both Mr. King, whose office was on the third floor, Tr. 17, and Mr. Stewart, whose office was on the second floor, Tr. 16–17, worked in this building. During the time in question, Mr. Stewart was DSS's chief financial officer. *See*, Tr. 10 (Mr. Stewart was originally hired as head accountant, after which Mr. King made him his CFO within 30 to 60 days); Tr. 11 (Stewart was hired to work in Panama for DSS); Tr. 12 (Mr. Stewart continued to work for DSS until 2011). Mr. King was not only the owner of DSS, he was also the boss. Tr. 10–11. Mr. King made the hiring and firing decisions at DSS. Tr. 11. Mr. King is not an officer of the DSS companies. *See*, Tr. 52–53. However, Mr. Stewart and everyone at DSS understood that Mr. King was the owner of DSS. Tr. 12. Agent Mangiocco testified that everything about which Mr. Stewart informed him indicated that even if the companies were in someone else's name, the companies were, in fact, owned by Mr. King, were set up by Mr. King, that Mr. King was the beneficial owner, that Mr. King was the real owner behind the scenes, and that these corporations and the building were Mr. King's. Tr. 131.

The DSS building was fenced. Tr. 14. To obtain access to the DSS building, one had to enter the parking lot, which was protected by a gate with a security guard at the entrance. Tr. 14. The gate was normally closed. Tr. 15. If the guard at the gate was familiar with an individual, the guard did not hesitate to open the gate and let the individual drive through. Tr. 15.

There were two entrances to the main building, one used by the people from the call center and one used by junior and senior DSS executives. Mr. Stewart (an executive) used the main entrance. That entrance was locked. It was necessary to use a security card to enter by this entrance. A person could swipe a key card to enter the building through this main entrance. If that did not work, a security guard was there to open the entrance. The security guard was supposed to be posted at this entrance to the DSS building "basically every day," but when Mr. Stewart arrived, there usually was no guard at the main entrance, only at the gate entrance. Tr. 15–16.

Mr. Stewart's office was on the second floor of the DSS building, past a door. Access past this door, to the second-floor hallway where Mr. Stewart's office was located, also required the key card. Tr. 16. Mr. King and the senior executives on the

Forbes, it was King's company." Doc. no 833, at 22 (Government's proposed findings of fact). More broadly, and consistent with these accurate assertions by the government, the court summarized King's status as follows in its <u>James</u> hearing findings:

> Bartice King (in this section: King) personified the enterprise from its origins in 2003 until the takedown in 2013. Transitioning from earlier sports betting activities under another name in Costa Rica, King established the Legendz enterprise in Panama in 2003. Apr. Tr. 233. Although he had trusted subordinates, some of whom controlled the collection and movement of large amounts of money, King was unques-

tionably in charge. Even though the agents, most or all of whom were U.S. based, reported on a day-to-day basis to others, he was their boss. *Id.* 151. He kept careful track of the enterprise's cash resources, spread as they were among several depositories. *Id.* 81–82.

Doc. No. 1021 (James Hearing Findings and Order), at 66.

As for DSS, the court noted, in its <u>James</u> hearing findings, that: "Regardless of what its record ownership might have been, DSS was the 'mother company,' or 'umbrella,' under which other Legendz companies were held or organized. Apr. Tr. 31–32." *Id.* at 19.

third floor had access to this part of the second floor hallway. Tr. 17–18. Of the approximately two hundred people who worked in the DSS building, approximately twenty-five or thirty possessed a key card that gave them access past the secured door on the second floor, into the area where Mr. Stewart's office was located. Tr. 18.

Mr. Stewart's office had a physical lock, for which he had a physical key. Tr. 19. Mr. Stewart believes that Mr. King probably had a master key which enabled him to get into Mr. Stewart's office. Mr. King made rounds in the building and "was all over the building." Tr. 20.

Mr. Stewart had a desktop computer in his office, which had access to servers located in other areas of the DSS building. Tr. 20–21. To log on to the computer for any purpose, including to access documents on the computer, it was necessary to enter a user ID and a password, which were created by the computer technicians. Tr. 21. After the user ID and the password were used to log on, Mr. Stewart could send and receive emails and access the Internet from his computer. Tr. 22. There were no separate passwords to access other computer documents. But Mr. Stewart could not access everything which was on the server. Tr. 22. The accounting work which Mr. Stewart performed for DSS, such as the spreadsheets he created, were kept on his computer in his office rather than on the corporate servers. Tr. 23. After Mr. Stewart "received various information from banking," he made a summary sheet. Tr. 23. He passed those sheets on to the individuals who had been approved by Mr. King to see those sheets. *Id.* Mr. Stewart could not access the server if he were not in his office, but he also had a laptop computer, which was his personal

property, which traveled with him, and from which he sometimes did work. Tr. 90.

In the beginning, Mr. Stewart met with Mr. King weekly to review the spreadsheets. Tr. 23. At some point, instead of reviewing them with Mr. King, Mr. Stewart reviewed the sheets with Max McLaren. Tr. 23–24. Mr. McLaren was the president of the DSS entities. Tr. 52–53. Throughout Mr. Stewart's employment, Mr. King communicated with Mr. Stewart regularly about the financial spreadsheets and documents. Tr. 24. In the beginning, Mr. King was more hands-on. Later, he was more hands-off and the two of them did not have that much communication. Tr. 24.

Mr. Stewart did not have permission or authorization to remove spreadsheets or any other documents related to DSS, to Legendz, or to any of the other entities for which Mr. Stewart did accounting. Tr. 24–25. Mr. Stewart was never given instructions about taking or not taking documents, and he never asked for permission to remove any document from the building. If Mr. Stewart had sought permission to remove any documents from the DSS building, he would have asked Mr. McLaren or Mr. King for such permission. Tr. 25.

The documents challenged by Mr. King's motion include spreadsheets, the majority of which Mr. Stewart prepared. Tr. 62. The documents at issue also include, as has been noted, a host of paper documents to which Mr. Stewart had access through his employment, such as weekly cash summaries, hotel receipts for a Super Bowl party sponsored by DSS, company emails, and other items regarding "the movement of monies" which Mr. Stewart was involved in as the chief financial officer of DSS. Tr. 67–68, 116; *and see,* Court's Exs. 1–11.[8] Most of the docu-

---

**8.** As previously stated, the challenged documents are included in ten marked envelopes

plus some loose materials. These documents were obtained by Mr. Stewart at various

ments turned over to Agent Mangiocco at the second meeting, which occurred on February 9, 2010, had been obtained by Mr. Stewart prior to that meeting. Tr. 61–62. Except for the thumb drive, the documents which Mr. Stewart was referring to at the first meeting had already been gathered by him. Tr. 62, 38 (Mr. Stewart loaded documents on the thumb drive before the second meeting to take to the ICE agent, but after the first meeting.) This batch of documents, along with the thumb drive, was then turned over at the second meeting, February 9, 2010.

A document purporting to list Legendz agents is also among the items of challenged evidence. The agent list is the only document which Mr. Stewart did not have access to in his usual course of business as chief financial officer for DSS, working at the DSS building. *See, e.g.*, Tr. 61–62 (all of those documents and the information on the thumb drive—apart from the agent list—were documents Mr. Stewart had ready access to through his employment at the DSS building).

The evidence shows that Mr. King owned DSS, owned the DSS building from which the documents were taken, that he was the boss in all material respects, that he was a familiar presence throughout the DSS building, and that he worked closely with Mr. Stewart, at least for a time, with

respect to some of the documents challenged such as the spreadsheets. Despite the fact that Mr. King was not a corporate officer, he was the beneficial owner of the premises and of the documents which were taken from DSS premises by Mr. Stewart for delivery to Agent Mangiocco.

Mr. King had a subjective expectation of privacy in the area searched, specifically, the premises of DSS, including the company's electronic and other records kept there. There were several levels of fairly stiff security measures including security guards, fenced and locked premises, a locked building, a locked hallway where Mr. Stewart officed with limited key card access, and protected access to company documents stored electronically on the premises. Even within DSS, access to the different floors of the building, to various offices, and to the type of documents which were provided by Mr. Stewart to Agent Mangiocco, was substantially restricted. In these circumstances, Mr. King's expectation of privacy in the seized documents is one which society is prepared to recognize as reasonable. Having carefully considered all of the evidence, the court concludes that the right of privacy asserted by Mr. King is a reasonable claim to privacy from government intrusion.

Mr. King has met his burden to prove standing to bring this fourth amendment challenge.[9]

times and were given to Agent Mangiocco in meetings which occurred from February of 2010 (their second meeting) to November of 2010. *See generally*, Tr. 108–129 (discussion of Court's Exhibits 1 through 11 and meetings in which documents were given to Agent Mangiocco).

**9.** As to burden of proof, *see*, Anderson, 154 F.3d at 1229, 1236 (stating the test in terms of what "the defendant must show"; and dissent's reference to the defendant's "burden to prove standing"). At the hearing (in a discussion regarding which party would proceed first with evidence), the court referred to the fact that, ordinarily, a warrantless search puts

the burden on the government to establish the applicability of some exception to the warrant requirement. That statement was expressly without prejudice to a determination of the burdens of proof which might apply to aspects of this particular motion. Tr., pp. 6–7. With respect to the standing issue, this court places the burden of proof on Mr. King. As discussed in the next section of this order, the Tenth Circuit does not appear to have addressed the burden of proof which applies to the government-actor issue. Regardless of which party is required to carry the burden of proof on any issue or sub-issue presented by this motion, the result reached in this order would be the same.

### 2. *Mr. Stewart as A Government Actor*

■ The court is not aware of a Tenth Circuit ruling determining which party bears the burden of proof when a defendant seeks to show that a private individual was acting as a government agent during a search and seizure for fourth amendment purposes. *See*, United States v. Donnes, 947 F.2d 1430, 1434 at n.5 (10th Cir. 1991) (noting district court placed the burden of proof on the defendant but that the Tenth Circuit had not expressed an opinion on this issue and did not do so in that decision). Nevertheless, this court must place the burden of proof upon one party or the other, and it places the burden on this issue on Mr. King.[10]

■ The test by which the court determines whether Mr. Stewart, a private person, was a government-actor when he searched for and seized the records in question and turned them over to Agent Mangiocco, is stated in United States v. Benoit, 713 F.3d 1 (10th Cir. 2013).

> It is well-settled that the Fourth Amendment "proscrib[es] only governmental action; it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." [U.S. v.] Jacobsen, 466 U.S. [109] at 113–14, 104 S.Ct. 1652 [80 L.Ed.2d 85 (1984)] (quotation omitted). "However, in some cases a search by a private citizen may be transformed into a governmental search implicating the Fourth Amendment if the government coerces, dominates or directs the actions of a private person conducting the search or seizure." United States v. Poe, 556 F.3d 1113, 1123 (10th Cir. 2009) (quotation omitted).

Accordingly, the question before us is whether the search conducted by De-Graffenreid and Kidd could be construed as a governmental search directed by Officer Moore. We have delineated a two-step inquiry to determine whether a search by a private individual constitutes state action:

> **First,** we determine whether the government knew of and acquiesced in the [private person's] intrusive conduct. **Second,** we consider whether the party performing the search intended to assist law enforcement efforts or to further his own ends. Both prongs must be satisfied considering the totality of the circumstances before the seemingly private search may be deemed a government search.

*Id.* (quotations and citations omitted). **We have additionally held** that "knowledge and acquiescence . . . encompass the requirement that the government agent must also affirmatively encourage, initiate or instigate the private action." United States v. Smythe, 84 F.3d 1240, 1243 (10th Cir. 1996). "[I]f a government agent is involved merely as a witness, the requisite government action implicating Fourth Amendment concerns is absent." *Id.* (quotation omitted). Police must, in "some affirmative way . . . instigate, orchestrate, encourage or exceed the scope of the private search to trigger application of the Fourth Amendment." *Id.* (citation omitted).

Benoit, 713 F.3d at 9, bold emphasis added.

The first part of the above-stated test requires Mr. King to prove that the government knew of and acquiesced in Mr. Stewart's intrusive conduct. Here, the intrusive conduct consists of locating, obtain-

---

**10.** *Donnes*, 947 F.2d 1434, n. 5, notes that the district court which heard that matter cited Seventh Circuit and Ninth Circuit decisions for the proposition that the defendant bears the burden of proof.

ing and taking out of DSS offices, and turning over to a federal agent, numerous DSS documents and electronic records, over at least a ten-month period from February 9 of 2010 (the date of the second meeting between Mr. Stewart and Agent Mangiocco, when documents were first provided by Mr. Stewart, Tr. 108) through November 8, 2010 (the date of the last meeting between Mr. Stewart and Agent Mangiocco during which documents were delivered by Mr. Stewart, Tr. 125).

The evidence establishes that the government knew Mr. Stewart was repeatedly obtaining sensitive documents from DSS which Mr. Stewart did not have permission to take away from DSS premises. There were at least eight different occasions during which Mr. Stewart personally turned over DSS documents to Agent Mangiocco. *See generally*, Tr. 108–129, plus a fax transmission of a document. Tr. 114. The meetings during which documents were delivered to Agent Mangiocco started in early 2010 and ended late that year. Before the first meeting, Mr. Stewart called Agent Mangiocco. He "expressed [his] concerns, told [the agent] what my [Stewart's] position was." Tr. 61. Stewart told the agent that he had documents that could prove what he was saying. Tr. 61.

During the first meeting between Mr. Stewart and Agent Mangiocco (at which no documents were delivered), Mr. Stewart explained DSS activities, the structure of the DSS business and his position in the business. Tr. 27–28. Mr. Stewart told Agent Mangiocco about documents which he had access to and which were already in his possession at that time. Tr. 28. By Agent Mangiocco's account, this meeting lasted "[m]aybe an hour, hour and a half,"

a period long enough for Stewart to thoroughly brief the agent on the Legendz operation.[11] Tr. 95. At the conclusion of that first meeting, Agent Mangiocco's "instructions" to Mr. Stewart were "to be my eyes and ears and provide any information that he came across without going out of his way and looking suspicious in any way." Tr. 95–96.

When Mr. Stewart took documents to Agent Mangiocco, Mr. Stewart routinely explained the documents. The two men would sit together and go over the documents. Tr. 29–30. There was no question about the source; Agent Mangiocco asked how Mr. Stewart had come into possession of the first documents provided, and Mr. Stewart explained that the source was "myself." Tr. 30. The thumb drive was delivered to Agent Mangiocco by Mr. Stewart at their second meeting, which occurred on February 9, 2010. Tr. 66, 105. Agent Mangiocco looked at the thumb drive evidence while Mr. Stewart was present. Tr. 110.

On March 4, 2010, Mr. Stewart faxed Agent Mangiocco a DSS document consisting of a list from Gigi Travel of people who would be coming to Panama or who had come to Panama. Tr. 114–115. At that time, Agent Mangiocco cautioned Mr. Stewart that it "wasn't wise to send faxes, period, because you don't know who would find the receipts or what was saved in the fax machine." Tr. 115. Agent Mangiocco was concerned that someone would learn that Mr. Stewart was faxing documents regarding DSS to the United States Embassy. Tr. 115.

Agent Mangiocco testified that all but two of the meetings during which documents were delivered to Agent Mangiocco

---

11. King does not appear to take issue with the agent's acquisition of this information (as distinguished from the documents that Stewart later gave to the agent), and the court is aware of nothing that would cast doubt on the propriety of this intelligence gathering exercise (which is what this initial meeting amounted to). Physical removal of documents is, of course, analytically quite distinct from verbal discussions.

were conducted at the United States Embassy in Panama. Tr. 105–129. The two meetings which were not at the embassy were conducted at Mr. Stewart's cleaning business in Panama. Tr. 112. Agent Mangiocco met with Mr. Stewart a total of approximately ten or twelve times. Mr. Stewart did not bring documents to all of those meetings. Tr. 103.

None of the documents which Mr. Stewart provided were obtained as a result of a United States search warrant or a Panamanian search warrant. Tr. 132–133.

Agent Mangiocco knew the documents provided by Mr. Stewart were the result of repeated intrusions by Mr. Stewart into DSS's business records stored on DSS premises, and that Mr. Stewart did not have permission from Mr. King or from anyone else at DSS to take these records. At no point did Agent Mangiocco ever indicate to Mr. Stewart that Mr. Stewart should not bring any documents to him. Nor did Agent Mangiocco ever express any disapproval to Mr. Stewart for bringing documents to him. Tr. 29.

Agent Mangiocco spent time reviewing all documents with Mr. Stewart. For example, as has been noted, Agent Mangiocco looked at the thumb drive while Mr. Stewart was present. Thus, Mr. Stewart helped Agent Mangiocco understand the documents which Mr. Stewart provided. Agent Mangiocco also advised Mr. Stewart about how to avoid detection when turning over documents, for example, cautioning Mr. Stewart not to raise suspicion and not to fax documents.

In May, 2010, after it was clear that Mr. Stewart could produce and had produced sensitive internal documents (including the agents list that was provided on March 2, 2010 [Tr. 113] ), Agent Mangiocco paid a "cultivation payment" of $2,000.00 to Mr. Stewart. This payment was made to let Mr. Stewart know "that we were serious, that we wanted him to continue working for us and for his motivation." Tr. 119.[12] *And see,* gov. ex. 2, ICE Form 73–293. Tr. 117. Agent Mangiocco paid the "cultivation payment" to Mr. Stewart at Mr. Stewart's Superior Cleaning business on May 10, 2010. Tr. 117–118. (On the ICE form, Gov. Ex. 2, Agent Mangiocco used to document and justify the $2000 payment, he checked the box for "C.I. Cultivation" rather than the box for "Purchase of Evidence." It is unlikely that Mr. Stewart would have cared which box was checked.)

The first part of the "government actor" test is satisfied. The government knew and acquiesced in Mr. Stewart's intrusive conduct consisting of his search and seizure of records from DSS premises and from DSS computers located on those premises. The Tenth's Circuits' additional requirement, described in Benoit, 713 F.3d at 10, as a part of the "knowledge and acquiescence" portion of the test, requires that the government must also affirmatively encourage, initiate or instigate the private action. That aspect of the test is likewise satisfied. Agent Mangiocco repeatedly instructed Mr. Stewart to be Agent Mangiocco's eyes and ears, he met with Mr. Stewart numerous times and at length to go over the documents which had been provided, and he paid Mr. Stewart a substantial cultivation payment to encourage Mr. Stewart to keep doing what he was then doing, namely turning over documents taken from DSS.[13]

---

**12.** In addition, after the April, 2014 hearing, but before the suppression hearing last month, the government paid Mr. Stewart approximately $40,000.00 in "living expenses" while in the United States. Tr. 50–51.

**13.** Any suggestion that the main thing the agent wanted was Mr. Stewart's verbally imparted information and that the internal DSS documents were merely the thirteenth doughnut in a baker's dozen would be wholly specious.

The court now turns to the second part of the "government actor" test. This part of the test requires the court to determine whether Mr. Stewart intended to assist law enforcement or to further his own ends.

At the outset, the court observes that when Agent Mangiocco was asked, "And is it fair to say that he [Mr. Stewart] was intending to assist law enforcement in bringing those documents to you?" Agent Mangiocco answered, without hesitation, "Yes." Tr. 133. Of course, this testimony is not conclusive on this issue, as the court must look at all of the circumstances to determine whether the second part of the test is met. Nevertheless, the unequivocal nature of the testimony is noted.

United States v. Poe, 556 F.3d 1113 (10th Cir. 2009), instructs the court to determine whether the individual who procured the evidence had a "legitimate, independent motivation to conduct the search." Id. at 1124. The bounty hunters in Poe "had a legitimate, independent motivation" for their intrusion—financial gain to be reaped for reasons entirely distinct from the benefit the government gained from the search. Id. Obtaining incriminating evidence was of no importance to the bounty hunters, as long as they got their man. Not so in the case at bar. In contrast to Poe, Mr. Stewart's motives were of a piece with those of the federal agent. Mr. Stewart's aim was to give maximum evidentiary benefit to the government by removing sensitive internal documents from DSS; while Agent Mangiocco's reciprocal aim was to get maximum evidentiary benefit from Mr. Stewart's seizure and delivery of DSS documents.

To be sure, Stewart was also interested in furthering his own ends, which included avoiding jail and the hope that he might one day return to the United States despite the fact that he had previously been deported from the United States. Tr. 65, 96. But his immediate mission and objectives were entirely aligned with those of the government, personified in this instance by Agent Mangiocco who forwarded all of the documents received from Mr. Stewart to another ICE agent, Eric Gann, in the ICE office in Houston, where a bulk cash smuggling case had been opened up and where Mr. King lived. Tr. 102. (The documents were either faxed or scanned to Agent Gann, or in some cases Agent Gann traveled to Panama at which times Agent Mangiocco gave him copies of documents obtained by Mr. Stewart. Tr. 102.) Unlike the motives of the actors in Poe, Mr. Stewart's motives were in no sense independent from his motive to assist law enforcement.

Of course, as the Court of Appeals has recognized, although the language of the second part of the test suggests the proposition is an either-or analysis, a strict binary analysis (assist law enforcement vs. further his own ends) cannot tell the whole story. "Almost always a private individual making a search will be pursuing his own ends—even if only to satisfy curiosity—although he may have a strong intent to aid law enforcement." United States v. Leffall, 82 F.3d 343, 347 (10th Cir. 1996). Leffall then states: "We hold this part of the test also requires that the court weigh the government's role in the search." Id. Thus, the nature and degree of the "government's role" in the search and seizure helps answer whether the second part of the test is met (whether a party performing the search intended to assist law enforcement efforts or to further his own ends).

Here, the government's role was much more than that of a witness and easily qualifies as an encourager of Mr. Stewart's search. The government encouraged Mr. Stewart in various ways, including a payment of $2,000.00 because "we wanted him to continue working for us and for his

motivation." Tr. 119. It is clear that what was being "cultivated" was continued searching for, and seizing of, sensitive documents which Mr. Stewart had no permission to remove, and which the government had no warrant to obtain, from DSS premises and from DSS computers located on those premises, as part of one or more federal investigations. Moreover, the government's role in the acquisition of the documents at issue was decidedly intertwined with Mr. Stewart's activities. The government's role included directing Mr. Stewart's document-gathering activity to some extent, warning him at the outset to avoid suspicion and, later, specifically warning him not to provide documents by fax transmission. And, as already stated, Mr. Stewart's acquisition and delivery of the documents to agent Mangiocco was not incidental to, or a byproduct of, some activity unrelated to the ends of law enforcement. Indeed, Mr. Stewart testified unequivocally that he removed the documents from the DSS property to provide them to Agent Mangiocco. Tr. 89.

Encouraged and directed by Agent Mangiocco in this manner, Mr. Stewart intended to assist law enforcement by taking and turning over numerous documents on an on-going basis for the better part of a year. This conclusion does not change due to the fact that Mr. Stewart was well aware that by assisting law enforcement he stood to gain personally. The second part of the "government actor" test is satisfied.

In reaching the above conclusion, the court has taken into consideration various arguments suggested by the government at the hearing concerning its view that Mr. Stewart was not acting as an agent on behalf of the government. These arguments have been considered and weighed as noteworthy factors. But, as explained below, they are not factors which are determinative in these circumstances.

One of these arguments is the government's position that Mr. Stewart was not transformed into a government actor based on the relationship between the ICE investigations and the criminal investigation and prosecution in this case. In closing, the government argued there was no search in the ICE investigation and necessarily there was no search as it relates to this particular case. Tr. 145. The government argued that it was only in August or September, at the time of the meeting with Agent Bowles, that Agent Mangiocco or Mr. Stewart became aware of the Legendz FBI investigation. Tr. 145. The government argued that "certainly none of the documents were procured at the behest of any of the agents in this case when they could have should have, would have, perhaps, gotten a search warrant." Tr. 145–146.

The evidence showed that after meeting with Mr. Stewart, Agent Mangiocco opened a money laundering investigation. Tr. 101. That investigation also involved suspected bulk cash smuggling, which Agent Mangiocco believes was the nature of the case that was opened in Houston (where Mr. King lived). Tr. 101–102. Agent Mangiocco passed all documents obtained from Mr. Stewart to an ICE case agent in Houston, Texas. Tr. 102. Agent Mangiocco became aware of the FBI's investigation out of this district in July or August of 2010. Agent Mangiocco then arranged for a meeting between FBI Agent Bowles and Mr. Stewart in September of 2010. Tr. 101. In short, throughout most of 2010, Mr. Stewart was used and directed as a government-actor on the behalf of the United States for the purpose of obtaining documents and other information which was relevant to overlapping federal investigations of Mr. King and Mr. King's companies, the DSS entities. The fact that there were overlapping investigations, which different agents opened or became aware of at different times, does not mean that Mr.

Stewart was not acting at the behest of the United States government when he obtained the documents.

The court's conclusions regarding the government-actor issue also are not changed by the government's contention that Agent Mangiocco never directed Mr. Stewart to obtain the agent list *specifically*, or that Agent Mangiocco never directed Mr. Stewart to obtain any document or documents *per se*. This is so for several reasons.

First, Mr. Stewart's January testimony, in which he denied being asked to obtain the agent list, is directly contradicted by his testimony on that subject in April of 2014, which was given before the government actor issue was put under the microscope.[14]

Second, even if directives to obtain *specific* documents or directives to obtain any documentation or documents *per se* were not given, directives of a general nature were indisputably given by Agent Mangiocco as he continued to acquire documents from Mr. Stewart. In Benoit, the Tenth Circuit noted testimony that "he [police officer Moore] never directed Ms. DeGraffenreid or Ms. Kidd to do anything ... all their actions were voluntary." Benoit, 713 F.3d at 10. Here, by contrast, there were repeated general directives such as "be the eyes and ears" of Agent Mangiocco, and instructions to provide any information which Mr. Stewart came across to the extent he could do so without raising suspicion. There was a very specific directive about how *not* to turn over documents (not by fax).

Third, there was clearly no need for Agent Mangiocco to instruct Mr. Stewart regarding what documents to get, or whether to obtain documents at all. In their first meeting on January 27, 2010, Tr. 97, which lasted "maybe an hour, hour and a half," Tr. 95, Mr. Stewart thoroughly briefed Agent Mangiocco on the Legendz operation. This briefing included detailed information about the call center, how the DSS entities were set up, and explained the movement of money from the United States to Panama. Tr. 95. Then, on February 9, 2010, approximately thirteen days after that first meeting, Mr. Stewart delivered the thumb drive and the first tranche of documents to Agent Mangiocco. Tr. 109–110. Once Stewart gave those documents to the agent in the second meeting at the United States Embassy, where the two men took the time to review the documents together (including the contents of the thumb drive), there was assuredly no need for the agent to "direct" Stewart to do anything. After that February 9, 2010 meeting, Mr. Stewart knew he was on the right track.

It was enough for Agent Mangiocco to make plain to Mr. Stewart, as he surely did in various ways by his conduct if not explicitly, that Mr. Stewart was doing a good job—good enough to warrant a substantial "cultivation" payment in May, 2010, after which Mr. Stewart provided several more batches of documents.[15] On

---

**14.** In the proceedings in April, 2014 (relative to James issues and the first round of motions to suppress) Mr. Stewart was asked if "He [Agent Mangiocco] asked you to try and get a list of agents, correct?" Mr. Stewart answered, "That is correct." Mr. Stewart was then asked, "That's how you came to ask someone within Legendz for access to that agent list?" Mr. Stewart answered, "He might have asked me if I had a list, but then I just gathered whatever I could." Ap. Tr. 120.

**15.** The court hastens to note that it is not at all critical of the payment, and no criticism is intended. That said, the making of the payment is very much in the mix with respect to the court's determination of whether Stewart was, under the governing authorities, a state actor. The focus, under the second prong of the state actor test, is on the *motivation* and the *intent* of the alleged state actor. Poe, 556 F.3d at 1123. Although there is no room in this record for any suggestion that Mr. Stew-

this point, it is noteworthy that the government's acquisition of the internal DSS documents was an iterative process which played out between the Agent Mangiocco and Mr. Stewart in numerous meetings over eleven months (eleven months includes the initial meeting in January in which no documents were delivered), resulting in the delivery of approximately ten sets of documents. This lengthy course of dealing leaves no room for any suggestion that Mr. Stewart was in any sense acting on his own, or that Agent Mangiocco had failed to convey to Mr. Stewart a firm understanding of the kind of material that was worth the risk which Mr. Stewart was clearly taking at the behest of the government.[16]

Thus, even setting aside the change in Mr. Stewart's testimony after the April, 2014 hearing and crediting the January, 2015 version of events (*i.e.* testimony that the agent list was never requested by Agent Mangiocco, and that no documents or documentation *per se* was requested at all), what the court confidently finds to be true is that Agent Mangiocco requested and encouraged Mr. Stewart to come up with whatever information and documentation he could over many months, as long as he was not so bold as to raise suspicion. Mr. Stewart did just that. In so doing, he was a state actor. The lack of specificity argued for by the government is a factor, but it is not determinative.

The court is also not persuaded by the government's reliance on United States v. Aldridge, 642 F.3d 537 (7th Cir. 2011). In Aldridge the Seventh Circuit held that the defendant's wife (Rivera) was not a government agent for purposes of protection from warrantless search and seizure. Although some of the facts of Aldridge are similar to those presented here, others are quite different. Among other things, the Seventh Circuit noted that Rivera, the alleged government actor, was married to the defendant and that agents may have assumed she had joint control over his records. *Id* at 541. There was no evidence of ratification, and the agents offered Rivera no reward for her cooperation. *Id.* at 541–42. The Seventh Circuit also found that the government was not directing Rivera. *Id.* at 542. Aldridge does not control.

Finally, the court has considered the government's argument that because Mr. Holness was the initial source of the agent list, this fact solves the government's problems with respect to the list. Mr. Holness worked in the VIP department. Tr. 55. Mr. Stewart approached Mr. Holness about this list after his initial contact with Agent Mangiocco. Tr. 55–56. Mr. Stewart approached Mr. Holness and asked if he had access to, or could obtain, an agent listing. Mr. Holness said "yes, but it will cost." Tr. 55. Mr. Stewart asked Mr. Holness for the agent list, paid $3,500.00 for it out of pocket, Tr. 55–57, Ap. Tr. 62–64, and turned it over to Agent Mangiocco on March 2, 2010. Tr. 113. In other words, Mr. Stewart did whatever was needed to provide the agent list to Agent Mangiocco. Mr. Holness's involvement is noted but does not change the fact that it was Mr. Stewart who was instrumental in obtaining the list for the government.

After careful consideration, the court finds and concludes that Mr. Stewart

---

art ever wavered in his intent to assist law enforcement, the payment would be relevant to an evaluation of such a suggestion.

**16.** The risk Stewart was incurring was by no means theoretical. Given the nature of Stewart's duties as CFO, the court can conceive of no satisfactory explanation Stewart could have given for attempting to remove the extremely sensitive agent list (which Mr. Stewart had to pay his fellow employee, Anthony Holness, to get) from the DSS premises.

should be treated as a government actor for purposes of the search and seizure of the documents in question.

### 3. *Lack of a Search Warrant and Suppression*

■ The limitations imposed by the Fourth Amendment apply to Mr. Stewart's conduct as a state actor. *See*, Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (party charged with the deprivation must be a person who may fairly be said to be a state actor; this may be because he is state official or because his conduct is otherwise chargeable to the state); Sloane v. United States, 47 F.2d 889 (10th Cir. 1931) ("[An officer] must not be permitted to do indirectly that which he cannot do directly, and thus circumvent the provisions of the Fourth Amendment against unreasonable search and seizures.").

The explicit premise of defendant's motion is that the Fourth Amendment protects Mr. King, as a United States citizen, from warrantless search and seizure, and that the Fourth Amendment does so despite the fact that the search and seizure occurred in Panama. The motion contends that because there was no warrant, fourth amendment standards were violated, with the result that the fruits of the search and seizure must be suppressed. The government argues only that Mr. King has no standing and that there was no government actor.[17] Having rejected the government's arguments, what remains is a warrantless search and seizure in violation of Mr. King's rights under the Fourth Amendment, along with the incumbent exclusionary rule. *See, e.g.*, United States v. Delaplane, 778 F.2d 570, 573 (10th Cir. 1985) (stating the exclusionary rule applies where American agents participate in a foreign search or where foreign agents act as agents for American counterparts, although those requirements were not met in that case). The motion will be granted.

### Ruling

Mr. King's second motion to suppress, doc. no. 982, is **GRANTED**. The documents included in Court's Exhibits one through eleven are inadmissible against defendant Bartice King.

This order requires the court to make some determinations with respect to the trial that is set for jury selection on February 10, 2015. The six defendants now set for trial are Bartice King, Luis Robles, Christopher Tanner, Paul Tucker, Robert

---

17. In one passing phrase offered in oral argument, the government's attorney stated that "A search warrant could not be obtained for a foreign entity...." Tr. 146. There is no evidence in the record one way or the other about the correctness of this statement, and no briefing addresses it. *And see*, United States v. Verdugo–Urquidez, 494 U.S. 259, 266, 283, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (at 266, stating historical data shows purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own government; *it was never suggested the provision was intended to restrain the actions of the federal government against aliens outside of U.S. territory*, at 266, all emphasis added; and Justice Brennan's dissent, 283 at n.7, observing that every court of appeals to consider the question has held that the Fourth Amendment applies to searches conducted by the United States government against United States citizens abroad). Although it is true that an issuing magistrate's writ does not run to the streets of Panama City, the court discerns no basis (and none has been asserted by the government), at least in the circumstances presented here, for a territorial limitation on the right of a U.S. citizen to a probable cause determination by "a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). Whether the warrant itself, when and if issued, is any good in Panama is not of great concern to the subject of the investigation. The fourth amendment value to be protected is the right to a judicial determination of probable cause.

Wilson and Zapt Electrical Sales, Inc. The suppressed evidence is inadmissible as to Bartice King, but admissible as to the other defendants.[18] This leaves the following alternatives available with respect to the upcoming trial:

- All six [19] defendants go to trial together, and the evidence is introduced, but the court gives a limiting instruction in favor of Mr. King with respect to the evidence that has been suppressed.

- All six defendants go to trial together, and the suppressed evidence is not introduced at all.

- The defendants other than Mr. King go to trial together, and the evidence is introduced, with Mr. King to be tried later.

- Mr. King stands trial alone on the February docket.

The government is **DIRECTED** to file, not later than January 23, 2015, a notice to the court advising the court as to which of the alternatives (or some other alternative) is favored by the government. The defendants who are set for trial in February may respond to the government's notice not later than January 27, 2015.

---

**18.** None of the other defendants have moved to suppress the evidence that is suppressed by this order (or otherwise contested the legality of the government's acquisition of that evidence), and it does not appear that any other defendant would, in any event, be in a position, as a matter of fourth amendment law, to do so. United States v. Johnson, 584 F.3d 995, 999 (10th Cir. 2009); United States v Poe, 556 F.3d 1113, 1121–23 (10th Cir. 2009); United States v. Rubio–Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990).

**19.** Mr. Wilson will not stand trial if he successfully enters a guilty plea. *See*, doc. no. 1113 (notice of hearing for a change of plea). That would leave five defendants to be tried in the trial starting on February 10.